**LONE STAR STEEL COMPANY and CF & I Steel Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

**Dalmine Siderca, S.A.I.C., Defendant-Intervenor.**

**Court No. 85–06–00790.**

United States Court of International Trade.

Nov. 28, 1986.

See also C.I.T., 649 F.Supp. 75.

Akin, Gump, Strauss, Hauer & Feld (Richard R. Rivers, Warren E. Connelly, Valerie A. Slater and William J. Long), Washington, D.C., for plaintiffs.

Lyn M. Schlitt, General Counsel, Michael P. Mabile, Asst. Gen. Counsel, and E. Clark Lutz, U.S. Intern. Trade Com'n, Washington, D.C., for defendant.

Mudge, Rose, Guthrie, Alexander & Ferdon (David P. Houlihan and Jeffrey S. Neeley), Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiffs challenge a final negative International Trade Commission ("ITC") determination.[1] ITC found that the injury suffered by the domestic oil country tubular goods ("OCTG") industry was not by reason of imports of OCTG from Argentina. Plaintiffs make two basic arguments: (1) ITC improperly failed to consider data regarding increased shipments of Argentine imports, lost sales and revenue and (2) ITC improperly failed to cumulate data on volume and effects of Argentine and Spanish OCTG imports.

### Facts

Plaintiffs filed administrative petitions on June 13, 1984, stating that OCTG from Argentina, Brazil, Mexico, Spain and Korea were being sold at less than fair value ("LTFV") and were causing or threatening material injury to the U.S. OCTG industry. See 19 U.S.C. § 1673 (1982). OCTG refers to several products, including oil well tubing, casing and drill pipe. Eventually affirmative final determinations under the antidumping laws were made with regard to Spanish OCTG. Final determinations were delayed in regard to the other countries concerned, except Argentina. Although LTFV margins on Argentine imports were found to be 61.7 percent, no antidumping duties were imposed because of the negative ITC injury determination under discussion here. Duties are required to be deposited upon entry of the same merchandise pursuant to separate proceedings under the countervailing duty laws, where no injury requirement was applicable and subsidies were found to exist.

---

1. The challenged determination is found in U.S. I.T.C. Publication 1694, May, 1985. A summary was published at 50 Fed.Reg. 21147 (May 22, 1985).

The record shows that channels of distribution and principal markets were the same for OCTG imports from Spain and Argentina. The record also shows that one type of OCTG was sold by importers of Argentine OCTG, but not importers of Spanish OCTG. Specifications of Spanish and Argentine OCTG differed.

Average margins of underselling were similar as between the imports of the two countries, but the trend of underselling with regard to the Argentine products was downward. Levels of underselling with regard to the Spanish product were increasing in 1984. ITC was able to obtain information on six possible instances of lost sales or revenue attributable to the price of Argentine imports. No other reason for lost sales surfaced. An additional sale was lost, according to the buyer, because the domestic supplier would only sell to the small distributor at end user, rather than distributor, prices. Approximately 500 tons of OCTG were involved in ITC's lost sales data. The demonstrated revenue lost in instances where Argentine imports competed, but the sale of the domestic product was made, was very small.

Volume of Spanish imports reflected a deep 1983 decline and a large 1984 surge.[2] Argentine imports volume was steady.[3] Shipments in the U.S. market, although lower than import volume, increased for both Spanish and Argentine imports from 1982–1984. Year end inventories as a percentage of U.S. shipments of the relevant imports decreased for both, but the percentages were consistently higher for Spanish imports.

Domestic OCTG consumption, production, shipments and capacity utilization statistics exhibited one pattern—low 1982 performance, less than half of that performance in 1983 and 1984 performance closer to 1982 levels. Employment and sales statistics dipped even lower in 1983 than did the statistics for the previous four factors,

and 1984 figures do not approach 1982 levels. Operating losses appear in 1983 and continue in 1984.[4] Based on such facts ITC found that the domestic industry was experiencing material injury. It concluded, however, that Argentine OCTG did not contribute to such injury.

### Reliance on Limited Criteria

■ ITC states that it based its negative injury determination with regard to Argentine OCTG on the following. Argentine OCTG import volume was low and stable, and the market share remained small. Levels of underselling decreased and year-end inventories of Argentine OCTG declined from 1982 to 1984.

These fact are accurate. Plaintiffs' objection is that other facts should have been considered and that those facts can only lead to the opposite conclusion. First, plaintiffs allege ITC did not consider shipments in the U.S. market. ITC obviously did so as demonstrated by the citation to inventories as a percentage of U.S. market shipments and by ITC's analysis of consumption. Plaintiffs also state that the decline in inventories reflects the release of a large quantity of stock so that shipments of Argentine imports in the U.S. market increased in comparison to U.S. shipments, giving Argentine imports a greater market share. This fact is evident from the record. ITC considered this increase, but noted that it was at a low level and was of a temporary nature.

The record reflects that because of anticipated demands in 1981, OCTG distributors increased their inventories. Demand did not materialize and inventories grew until demand rose in 1983. Shipments of Argentine imports did increase greatly in 1983, while new imports decreased, but the rate of increase dropped dramatically in 1984, as did the level of inventories. As shares of consumption, Argentine imports were almost equal in 1982 and 1984. The 1983

2. Spanish imports volume was: 1982–54,000 tons; 1983–23,000 tons; 1984–76,000 tons.

3. Argentine imports volume was: 1982–17,000 tons; 1983–16,000 tons; 1984–20,000 tons.

4. $.53 billion in operating income in 1982 turns into a $.26 billion operating loss in 1983 and a $.16 billion loss in 1984.

bulge is consistent with the unexpected lack of demand and a subsequent release of stored inventory. Plaintiffs attribute the 1984 return to 1982 levels as a reaction to unfair trade cases, for which the plaintiffs argue ITC must adjust. ITC's historical explanation is equally plausible. In this context, standing alone, the single factor of the increase in shipments does not mandate an affirmative finding.

Second, plaintiffs claim that underselling, even though it was decreasing, and the evidence of lost sales and revenue, demonstrate injury. Anecdotal evidence of lost sales and revenue rarely adds distinct information to a record of this type but rather confirms what is already substantially demonstrated by the presence of fairly fungible products from both Argentina and the United States in the market place, decreasing demand, rising shipments of imports and underselling by imports. These facts alone are evidence of lost sales and revenue due to imports and, more particularly, lost sales due to pricing. Thus, the point made here by plaintiffs is the same as is made in their first argument. The historical and economic context also provides the same explanation as it did previously. The court has indicated on other occasions that instances of lost sales alone do not mandate a finding of injury; rather it is for ITC to determine whether lost sales, together with other factors, indicate a causal nexus between LTFV imports and material injury to the domestic industry.[5]

■ The court finds substantial evidence for ITC's conclusion that a historical economic occurence led to U.S. industry injury, which was exacerbated by steadily rising imports from various countries. It also finds support for ITC's conclusion that the pattern demonstrated by data regarding Argentine LTFV imports varies from the pattern of injury to the U.S. industry. For example, domestic industry performance deteriorated substantially between 1982 and 1984, while Argentine imports remained stable, and the 1983 increase in market share all but evaporated. As a whole the record adequately supports the ITC determination that the material injury suffered by the U.S. industry was not caused in any significant way by OCTG from Argentina.

## Cumulation

■ As the parties readily admit, the cumulation provision of the Trade and Tariff Act of 1984, 19 U.S.C. § 1677(7)(C)(iv) (1982 & Supp. III 1985) does not apply directly to the proceeding under review. Nor have the parties cited any authority indicating that in enacting the 1984 provision Congress was merely clarifying previous law.

Prior law allowed ITC substantial discretion in determining whether to cumulate data on volume and effects of imports. Under such law, where there is data, apart from the data sought to be cumulated, that supports the conclusion that imports from one country do not contribute to material injury or do not compete in the same markets as the other imports involved, ITC properly may consider it inappropriate to cumulate data. *See, e.g., Gifford-Hill Cement Co. v. United States*, 9 CIT ——, 615 F.Supp. 577 (1985). On the other hand, it may very well be an abuse of discretion to fail to cumulate solely because the very data sought to be cumulated is insufficient standing alone to establish a causal connection to material injury.[6]

The ITC majority states that it did not cumulate data because the patterns of import volume and market share differed as to imports from the two countries.[7] One commissioner also noted, *inter alia*, that the specifications of the Spanish and Argentine products were different.

---

5. The lost revenue data is so minimal as to be virtually meaningless.

6. Avoidance of this type of circularity may have been one of the reasons for the 1984 cumulation provision.

7. One commissioner would require "concerted action" before cumulating. If this implies some intention requirement, there was no authority cited for such a position.

If the ITC majority had listed small volume or market share as its reason for not cumulating, the validity of the legal basis on which it rests its decision would be debatable. Here, however, rather than just absolute levels, numerous trends, including those cited by the majority, reveal significant differences in the effects of Argentine and Spanish imports. Absent from this case are two classic patterns. The first is where competing imports from two countries, if considered alone, might be said to have a *de minimis* impact, but considered together the effect is significant. The second is where one country's imports cause injury and another country's imports, although of small volume, contribute in some way to injury when added to the other imports. Here the finding of ITC is that no contribution to injury by Argentine OTCG existed. In this case, cumulation of data would obscure significant differences in trends. Prior to the effective date of the 1984 statutory amendment, ITC could consider this type of data in making its discretionary determination on cumulation. In addition, there is a problem in stating that Spanish and Argentine goods compete in the same market and therefore cumulation is appropriate. There is little overlap in the subcategories of OCTG products imported from the two countries and thus competition in the same markets by all relevant imports is unlikely.[8]

Plaintiffs have not demonstrated that an improper legal standard was applied under prior law. Furthermore, the subcategory product data, not cited by the ITC majority, does not lead to an opposite conclusion, but merely bolsters the decision. Therefore, the court finds ITC acted within its discretion in not cumulating data on Argentine and Spanish OCTG imports.

ITC's determination is found to be based on substantial evidence and to be in accordance with law.

8. Plaintiffs cite *American Grape Growers Alliance v. United States,* 9 CIT ——, 615 F.Supp. 603 (1985) for the proposition that the court cannot consider subcategories of the "like prod-

uct" under discussion. *American Grape Growers,* however, involved a preliminary determination and does not control a pre-1984 discretionary cumulation decision at the final stage.