**MAVERICK TUBE CORP. and Tex–Tube Div., Cyclops Corp., Plaintiffs,**

v.

**UNITED STATES and the United States International Trade Commission, Defendants,**

**and**

**IPSCO Inc. and IPSCO Steel Inc., Defendant–Intervenors.**

Court No. 87–04–00636.

United States Court of International Trade.

May 24, 1988.

1570

Schagrin Associates (Roger B. Schagrin, Paul W. Jameson and Mark C. Del Bianco), Washington, D.C., for plaintiffs.

Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, U.S. International Trade Com'n (Jack M. Simmons, III), Washington, D.C., for defendants.

Barnes, Richardson & Colburn (Rufus E. Jarman, Jr. and Matthew J. Clark), Washington, D.C., for defendant-intervenors.

DiCARLO, Judge:

Plaintiffs move under Rule 56.1 of the Rules of this Court ·for judgment on the agency record to contest the 4–1 negative preliminary determination of the United States International Trade Commission (Commission) that there is no reasonable indication that a United States industry is being materially injured by reason of imports of welded carbon steel line pipes and tubes from Canada at less than fair value (LTFV). *Certain Line Pipes and Tubes From Canada,* Inv. No. 731–TA–375 (Preliminary), USITC Pub. 1965 (Mar.1987); 52 Fed.Reg. 11,349 (Apr. 8, 1987). This Court has jurisdiction under 19 U.S.C. § 1516a(a)(1)(C) (Supp. IV 1986) and 28 U.S.C. § 1581(c) (1982). The Court holds, consistent with *USX Corp. v. United States,* 12 CIT ——, Slip Op. 88–30 (Mar. 15, 1988), that one Commissioner's use of a predatory pricing analysis underlying a 2.5 percent rebuttable presumption and another Commissioner's elasticisity estimates are not supported by substantial evidence and are not in accordance with law. The Court also remands a portion of the determination of two other Commissioners to consider whether the likelihood of contrary evidence on the "Southern Colorado" sale alters their assessment of material injury or threat of material injury.

## STANDARD OF REVIEW

This Court will overturn a negative preliminary material injury determination of the Commission when it is "arbi-

trary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A) (1982). The Commission's role in a preliminary injury determination is to decide, based on the best information available to it at the time, whether there is a reasonable indication that a domestic industry is being materially injured or threatened with material injury by reason of imports of the merchandise under investigation. 19 U.S.C. § 1673b(a) (1982). In *American Lamb Co. v. United States*, 4 Fed.Cir. (T) 47, 55, 785 F.2d 994, 1001 (1986), our appellate court affirmed the administrative interpretation of this statute as meaning that the Commission should reach a negative injury finding in a preliminary investigation only when the record as a whole contains clear and convincing evidence that there is no material injury or threat of material injury by reason of imports, and there is no likelihood that contrary evidence will arise in a final investigation.

## DISCUSSION

The Commission found that the industry against which the impact of the alleged LTFV imports was to be assessed was the industry producing welded carbon steel line pipe of 0.375 inches or more but not over 16 inches outside diameter, classifiable under items 610.3208 and 610.3209 of the Tariff Schedules of the United States Annotated. USITC Pub. 1965, at a-2. *See also id.* at 5–7, 27, 36–37. These line pipes and tubes (line pipe) are generally used to transport gas, oil, or water in pipeline or utility distribution systems. *Id.* at a-2 to a-3. Each of the Commissioners found a reasonable indication that the domestic industry has been materially injured, *id.* at 12, 30, 38, 50, but four of the five Commissioners voting found that the material injury was not caused "by reason of" imports of Canadian line pipe. Plaintiffs assert that the Chairman and Vice–Chairman used improper economic analyses, and that two of the other Commissioners reached incorrect conclusions of fact.

## I. *Rebuttable 2.5 Percent Presumption*

■ In determining whether there is a reasonable indication that a United States industry is materially injured or threatened with material injury by reason of imports, the Commission is directed to consider as a factor the volume of imports of the merchandise which is the subject of the investigation. 19 U.S.C. §§ 1671b(a) and 1677(7)(B)(i) (1982). In evaluating the volume of imports, the Commission is instructed to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to the production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i) (1982).

■ To "give effect" to 19 U.S.C. § 1677(7)(C)(i), the Commission Chairman employed "a rebuttable presumption that an import penetration ratio, after cumulating imports as required, of less than 2.5 percent of apparent U.S. consumption is too small to be a cause of material injury and that any increase in the import penetration to less than 2.5 percent is too small to constitute a threat of material injury." USITC Pub. 1965, at 31–32. The Chairman stated that "[t]his presumption can be rebutted by showing that *both* domestic supply and demand for the product are inelastic." *Id.* at 32 (emphasis in original). A footnote refers to three determinations "[f]or a complete discussion of the rationale behind this 2.5 percent presumption." *Id.* at n. 12. An examination of the determinations cited as support reveals that the "2.5 percent presumption" is based upon a predatory pricing analysis more akin to antitrust than antidumping. *See, e.g., Certain Welded Carbon Steel Pipes and Tubes for the People's Republic of China,* Inv. No. 731–TA–292 (Final), USITC Pub. 1885, at 17–28 (Aug.1986) (Additional Views of Chairman Liebeler); *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela,* Inv. No. 701–TA–242 (Preliminary), USITC Pub. 1680, at 19–30 (Apr.1985) (Separate Views of Vice Chairman Liebeler). *See also* De-Grandis, *Proving Causation in Antidumping Cases,* 20 Int'l L. 563, 586–88

(1986); Jameson, *Recent International Trade Commission Practice Regarding the Material Injury Standard: A Critique*, 18 Law & Pol'y in Int'l Bus. 517, 548 (1986). This predatory pricing analysis was recently analyzed and rejected in *USX Corp. v. United States*, 12 CIT ——, Slip Op. 88–30, at 5–17 (Mar. 15, 1988). Consistent with the holding in *USX Corp.*, the Court finds that predatory pricing analysis underlying the 2.5 percent presumption is not based on substantial evidence and is not in accordance with law.

## II. *Causation Analysis Based on an Elasticity Estimate*

 Like the Chairman, the Vice Chairman determined that the domestic industry was materially injured. The Vice Chairman also found that the injury was not by reason of Canadian imports.

In her individual views, the Vice Chairman stated:

> To analyze the effects of dumped imports on the domestic industry, it is necessary to consider, among other key factors, the import penetration ratio of the dumped imports and the alleged dumping margin.

USITC Pub. 1965, at 38. She noted that the market shares of line pipe from Canada were 1.0 percent in 1984, 0.7 percent in 1985, and 1.1 percent in 1986, and that the average alleged dumping margin was 44.3 percent. *Id.* at 39. The Vice Chairman then made a number of assumptions. First, she assumed that the entire dumping margin was passed through to reduce the price of the imports. Second, she assumed that without dumping, imports from Canada would have been priced almost 50% higher, and would therefore have been priced out of the market. Third, she assumed that the United States industry would supply all of the line pipe that the Canadians would have supplied. *Id.* at 40–41. Using these assumptions, the Vice Chairman calculated that the dumped imports from Canada reduced shipments from United States producers by at most 1.9 percent. *Id.* at 41.

The Vice Chairman next stated that "[i]t is also possible to determine an *upper bound* for the degree to which the dumped imports suppressed domestic prices." *Id.* (emphasis in original). To calculate this figure, she used a supply elasticity estimate for the United States basic steel industry based on 1956–76 data, which "indicates that a 1 percent increase in domestic price will produce at least a 3.5 percent increase in the quantity supplied by domestic producers." *Id.* From this bit of information, she concluded that "a 1.9 percent increase in demand for domestic product will lead to an increase in domestic price of only 0.6 percent." *Id.* at 41–42. The combined effect of the increased sales and increased price from the elimination of the Canadian product from the market would be 2.5 percent of the U.S. industry's revenue, from which the Vice Chairman concluded that "the adverse effects of dumped imports from Canada on the domestic industry were too small to be a cause of material injury to that industry." *Id.* at 43.

Plaintiffs argue that the Vice Chairman's error is not in considering elasticity, but in trying to precisely calculate the degree of elasticity using information which was not collected during the investigation and which has no bearing on the line pipe industry.

This Court has approved the use of valid economic models to assist the Commission in its causation analysis. *USX Corp. v. United States*, 12 CIT ——, Slip Op. 88–30 at 19 (Mar. 15, 1988); *Alberta Pork Producers' Mktg. Bd. v. United States*, 11 CIT ——, 669 F.Supp. 445, 461–65 (1987). Although the Commission does not need to establish the accuracy of elasticity estimates to a scientific degree of certainty before they may be used, this does not preclude a requirement that some threshold degree of reliability be established in the record if commissioners rely almost exclusively on these estimates in fulfilling their statutory task. *USX Corp.*, 12 CIT at ——, Slip Op. 88–30 at 20.

The same 3.5 percent elasticity estimate that the Vice Chairman used in this determination was recently rejected as nonrelia-

ble and thus legally flawed in *USX Corp. v. United States*, 12 CIT —, Slip Op. 88–30 at 17–23 (Mar. 15, 1988).

Drawing upon *Alberta Pork Producers'*, the *USX Corp.* court first noted that expert testimony and adversarial participation in the administrative process help assure the basic reliability of the elasticity estimates upon which commissioners may wish to rely. In *USX Corp.*, however, the 3.5 elasticity estimate was applied without seeking input from any of the parties. As in *USX*, the 3.5 elasticity estimate was applied in this preliminary determination without opportunity for the parties to comment or present evidence on its reliability.

With the court proceedings as the first opportunity for the parties in *USX Corp.* to comment on the reliability of the 3.5 elasticity estimate, the court found that it is based on data compiled decades ago and without other support could not reliably establish assumptions about the state of the current steel industry given subsequent technological advances and other changes in the industry. The court also found the 3.5 estimate to refer the carbon steel industry in general, but there was no evidence in the *USX* record to indicate why an estimate for the carbon steel industry in general could be used to reach conclusions regarding only the cold-rolled plate and sheet segment of that industry.

As in *USX*, there is no support in this record to establish the reliability of the underlying data compiled decades ago. Furthermore, the study underlying the 3.5 estimate limits itself by stating that "[c]onclusions based on the price behavior, cost conditions, and international competitives of the U.S. carbon steel industry cannot be extended to the specialty steel industry." R.W. Crandall, *The U.S. Steel Industry in Recurrent Crisis* 5 (1981). Plaintiffs have argued to this Court that "[l]ine pipe producers are not in the same industry as the basic steel industry—they are *customers* of that industry, buying the hot-rolled coil to weld into pipe." Plaintiffs' Brief, at 54–55 (emphasis original). The record contains no evidence why these estimates for the carbon steel industry apply to line pipe producers. In *Alberta Pork*, this Court rejected reliance upon estimates that did not describe the specific product under investigation.

Following *USX Corp.*, the Court finds that the use of the 3.5 percent elasticity estimate in this determination is not based on substantial evidence and is not in accordance with law.

### III. *Commissioners Lodwick and Rohr*

Plaintiffs argue that Commissioners Lodwick and Rohr ignored the factual record and reached a determination that is arbitrary and capricious, constitutes an abuse of discretion, and is not in accordance with law.

### A. *Lost Sales*

■ Commissioners Lodwick and Rohr found no volume effects of imports, no significant underselling or pattern of price leadership, no adverse effects on profitability, and stated that in the absence of any alleged price suppression or price depression the plaintiffs' case is "reduced to an analysis of the individual sales transactions allegedly lost to Canadian imports on account of price." USITC Pub. 1965, at 20. Commissioners Lodwick and Rohr found that the United States industry lost four sales to a Canadian producer, IPSCO, but that these sales were lost for reasons other than price. Plaintiffs argue that Commissioners Lodwick and Rohr reached incorrect conclusions on these four sales.

An examination of evidence of lost sales could help establish that "but for" the imports at less than fair value, the buyer would have purchased the domestic product. DeGrandis, *Proving Causation in Antidumping Cases*, 20 Int'l L. 563, 568 (1986). However, lost sales alone do not mandate an affirmative finding of injury; rather the Commission must determine whether lost sales, together with other factors, indicate a causal nexus between the imports at less than fair value and material injury to the domestic industry. *Lone Star Steel Co. v. United States*, 10 CIT —, 650 F.Supp. 183, 186 (1986).

### 1. *The Mountain Fuel Sale*

■ The most substantial transaction concerned was Mountain Fuel Supply Company of Salt Lake City, Utah, a public utility which solicited bids for two sizes of pipe. USITC Pub. 1965, at 20. USX Corp. (formerly U.S. Steel Co.), a United States industry, submitted the lowest price bid on both sizes of pipe but could not guarantee a delivery date because workers at the USX Mill in Provo, Utah were on strike. The record indicates that Mountain Fuel waited as long as possible before awarding the contract in hopes that the work stoppage would end and that this United States producer could fulfill the order. Pub.Doc. 23 at appendix 2; Conf.Doc. 9 at a–42.

Meanwhile, a third party inspector hired to evaluate the ability of the second lowest domestic bidder to supply part of the contract questioned the ability of this domestic producer to meet Mountain Fuel's product requirements in quantity and quality. Conf.Doc. 10 at 5–6, Conf.Doc. 9 at a–38, a–42 to a–44; Pub.Doc. 23 at appendix 2; Pub.Doc. 16 at 57–58.

The record contains evidence that Mountain Fuel was facing time pressures to meet its construction schedule and awarded the contract to the Canadian producer which could fulfill the contract requirements under the time schedule. Pub.Doc. 14 at exhibit 2. Commissioners Lodwick and Rohr found the Canadian producer received the order "for non-price reasons." USITC Pub. 1965, at 21.

The record shows that the strike at USX precluded USX from supplying the pipe in a timely fashion. The Court finds it reasonable for Commissioners Lodwick and Rohr to conclude that the domestic industry lost the contract for this non-price reason.

Plaintiffs argue that Commissioners Lodwick and Rohr failed to address the existence of the other domestic bidders, which plaintiffs argue lost the contract to the Canadians on the basis of price. Conf.R. Doc. 9 at attachments; Conf.R.Doc. 10 at a–41 n. 2.

Defendants reply that the plaintiffs' position is fallacious because it is based on a comparison of prices for both materials and transportation (i.e., f.o.b.). Defendant argues that because transportation over the Rocky Mountains to Utah from Texas mills would be more expensive than transportation from Canada with no intervening mountains, the fact that the Canadian prices on a delivered basis are lower than those for certain domestic producers does not imply that the price of Canadian line pipe, net of transportation costs, is necessarily lower. Defendants' Brief, at 33–34. The Commission argues that the antidumping laws cannot be used to penalize Canadian producers because they are located closer to a United States customer and thus have a competitive economic advantage in lower transportation costs. *See British Steel Corp. v. United States,* 8 CIT 86, 95–96, 593 F.Supp. 405, 412–13 (1984).

The Court does not reach the question of whether the record contains sufficient evidence to support the claims that the Canadians have a competitive economic advantage in lower transportation costs. Based on the evidence that one domestic producer was on strike and another was found unable to satisfy the contract requirements, and with the evidence that the buyer's time constraints made it infeasible to search out other domestic producers, it was reasonable for Commissioners Lodwick and Rohr to find that the Mountain Fuel sale on a basis other than price, even without addressing the other domestic producers. "The Commission need not discuss every issue raised in its determination even though it has been raised at the administrative level." *Empire Plow Co. v. United States,* 11 CIT ——, 675 F.Supp. 1348, 1354 (1987).

### 2. *The Henderson, Colorado Sale*

■ A distributor in a suburb of Denver, Colorado sought out the Canadian producer as an alternative source of supply and placed a small trial order for pipe "so long as IPSCO met prevailing domestic prices." Conf.Doc. 8, Appendix 4; USITC Pub. 1965, at 21–22. Commissioners Lodwick and Rohr concluded that because there was no request for bids from any domestic producer, there was no sale lost

by the domestic industry. USITC Pub. 1965, at 22. The Commissioners also found that with the shutdown of mills in Colorado and Utah, the distributor was highly reasonable to search for alternate sources of supply, given the distances from that purchaser to most other domestic purchasers. *Id.* The Court finds it reasonable for Commissioners Lodwick and Rohr to conclude that this small trial order to test a new source of supply at prices prevailing in the United States was not a sale lost to the domestic industry on the basis of price.

### 3. *The "Southern Colorado" Sale*

 Plaintiffs argue that a "Southern Colorado" contract was awarded to a Canadian producer even though a United States producer submitted a lower bid, and cite evidence in the record that this was a sale lost to the domestic industry on the basis of price. Pub.Doc. 23, at 22, 62–63; Conf. Doc. 9 at a–44. Commissioners Lodwick and Rohr found evidence in the record to show that the Canadian producer was awarded the contract because it could meet delivery requirements. USITC Pub. 1965, at 22, citing Pub.Doc. 16, at 63–63 (transcript). The Commissioners' determination cited only to the transcript, and not to the business proprietary evidence upon which plaintiffs rely.

Plaintiffs argue there is a strong likelihood that contrary evidence will surface in a final investigation.

The record expressly states that the evidence upon which the Commissioners relied is "not certain." Pub.Doc. 23, at 22; Conf. Doc. 6, at 22. There is thus a likelihood that contrary evidence will arise in a final investigation. Under *American Lamb*, 4 Fed.Cir. (T) at 55, 785 F.2d at 1001, the Commission should make a negative injury finding in a preliminary investigation only when there is no likelihood that contrary evidence will arise in a final investigation. However, it is by no means certain that even if the "Southern Colorado" sale is found to be an additional lost sale that it would sufficiently change the Commissioners' overall assessment of material injury or threat of material injury caused by rea-

son of imports. As already noted, lost sales alone do not mandate an affirmative injury determination. *Lone Star Steel Co.*, 10 CIT at ——, 650 F.Supp. at 186.

Given that the record plainly labels the only evidence relied upon as "not certain" when the plaintiff has cited evidence to the contrary in the confidential record, the Court remands this portion of the Commissioners' determination to consider whether the likelihood that contrary evidence will arise in a full investigation changes the Commissioners' assessment of material injury or threat of material injury.

### 4. *The Total Petroleum Sale*

 Commissioners Lodwick and Rohr found that the Canadian producer's distributor won a contract for 1600 tons of 10¾" line pipe on the price basis of the total package, which included coating and delivery to the installation site. The two Commissioners found no lost sale because "the prices offered by IPSCO and Lone Star to their distributors were approximately equal." USITC Pub. 1965, at 22.

Plaintiffs complain that Commissioners Lodwick and Rohr did not address the existence of other domestic bidders.

As noted, the Commission need not discuss every issue raised in its determination even though it has been raised at the administrative level. *Empire Plow Co.*, 11 CIT at ——, 675 F.Supp. at 1354. The record supports a finding that each of the domestic bids was non-responsive. Conf. Doc. 9 at a–44. Based on the record, the Court finds it reasonable for Commissioners Lodwick and Rohr to discount this transaction.

### B. *Price Undercutting*

 The Commission considers price undercutting as a factor in examining the price effects of imports under investigation. 19 U.S.C. § 1677(7)(C)(ii)(I) (1982); 19 C.F.R. § 207.26(b)(2)(i-ii) (1987). Commissioners Lodwick and Rohr found "no significant underselling or pattern of price leadership" by Canadian imports. Plaintiffs argue that pricing data in the record showed that Canadian prices were lower in five of seven instances. *See* USITC Pub.

1965, at 53. As a strict percentage, plaintiffs argue that underselling in 71% of the instances hardly seems like "no significant underselling," and assert that the determination of the two Commissioners is arbitrary, capricious, and not in accordance with law.

The record indicates Canadian underselling in three of five instances. Pub.Doc. 28, at 5; Conf.Doc. 9, at a–41. The statute directs the Commission to consider whether

(I) there has been *significant* price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a *significant* degree or prevents price increases, which otherwise would have occurred, to a *significant* degree.

19 U.S.C. § 1677(7)(C)(ii) (1982) (emphasis added).

The legislative history is consistent with the express language of the statute:

With respect to prices in the United States of the like product, the [Commission] would consider whether there has been any *significant* price undercutting by the imported merchandise, and whether such imports have depressed or suppressed such prices to a *significant* degree.

S.Rep. No. 249, 96th Cong., 1st Sess. 87 (1979), *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 473 (emphasis added). The report of the Committee on Ways and Means of the House of Representatives is similar:

With regard to price effect, the [Commission] shall consider whether domestic prices are being *significantly* undercut or suppressed.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 73 (1979).

Commissioners Lodwick and Rohr noted the general price trends for line pipe products and found a mixed pattern of underselling and overselling when the prices of Canadian imports were compared with domestic prices. The Commissioners stated "[t]here is no discernible pattern of price leadership by the imports from Canada."

USITC Pub. 1965 at 18. These Commissioners found it particularly significant that the domestic producers were "unaware of direct instances of price depression or price suppression due to imports of line pipe from Canada, although line pipe producers other than petitioners may have experienced such price effects." *Id.* at 18–19, *citing* Pub.Doc. 1 at 13 (petition). The Commissioners noted that no other domestic producer provided any allegations of price suppression or depression or any evidence that would support an inference of price suppression or depression. *Id.* at 19. The Commissioners also noted that there was no other evidence of price suppression or depression. Defendant argues that the Commission is entitled to find that the lack of such allegations by parties who should know the market well is particularly persuasive. Defendants' Brief at 28.

The Commissioners also turned to the issue of the unit value of imports, a matter of particular concern to plaintiffs during the investigation because the plaintiffs had relied heavily on falling unit values during 1985 and 1986. Pub.Doc. 1 at 9, 10. The Commission's information showed that the unit value of Canadian exports to the United States increased sharply from 1984 to 1985 and then decreased from 1985 to 1986, achieving a level below that of 1984. USITC Pub. 1965 at 19. As Commissioners Lodwick and Rohr stated,

[t]hese data should not be examined in a vacuum, however. Unit values per ton for all imports generally increased from 1984 to 1985 and declined from 1985 to 1986. Unit values per ton for U.S. producers' domestic shipments decreased from 1984 to 1985 and again from 1985 to 1986. Unit values from Canada were below those of domestic producers in 1984 and 1986, but were significantly higher than that of domestic producers in 1985. Although petitioners apparently believe that the decline from 1985 to 1986 led to decreasing prices on imports from Canada and to individual transactions lost by the domestic industry because of the price of the allegedly [less than fair

value] imports, the record does not bear this out.

In the first place, the financial data do not reveal harm by reason of the prices of the imports. The relationship of price to cost of goods sold for the domestic industry has improved appreciably, with reported gross margins on line pipe operations increasing 16.6 percentage points from 1984 to 1986.

In the second place, as we have found no volume effects of the imports, no significant underselling or pattern of price leadership, no adverse effects on profitability, and as petitioners have not alleged any price suppression or price depression, petitioners' injury case is reduced to an analysis of the individual sales transactions allegedly lost to Canadian imports on account of price.

USITC Pub. 1965, at 19–20 (footnotes omitted). The sales allegedly lost on the basis of price are those which have already been discussed. The Court also notes that the presence of even significant price undercutting would not necessarily give decisive guidance with respect to the Commission's determination of material injury. 19 U.S.C. § 1677(7)(E)(ii) (1982); *accord Lone Star Steel Co.,* 10 CIT at ——, 650 F.Supp. at 186.

The Court finds it reasonable and according to law for Commissioners Lodwick and Rohr to go beyond merely identifying the presence of underselling to consider whether that underselling is significant in determining whether there is a causal nexus between imports and injury. The Court does not accept plaintiffs' argument that the presence of underselling establishes its significance.

C. *Threat Of Material Injury By Reason Of Increased Imports*

 Commissioners Lodwick and Rohr found no threat of material injury by reason of increased imports because the increase in Canadian imports was attributable to a strike at USX mills in the Rocky Mountain area. USITC Pub. 1965, at 25; Plaintiffs' Brief, at 28. Plaintiffs argue that the Commissioners failed to recognize

that the USX strike presented an ideal opportunity for domestic producers other than USX to sell in the Rocky Mountain region.

The record shows that a number of mills closed in 1986. Lone Star Steel's mill in Fort Collins, Colorado closed in the fall of 1986, apparently before the asserted surge in imports. USITC Pub. at 16. The mill remained closed "due to lack of business." *Id.* at 16–17, citing Pub.Doc. 16 at 25 (Transcript). Commissioners Lodwick and Rohr noted that there was no evidence of record that the shutdown of the Fort Collins mill was caused by imports from Canada, nor was there any allegation to that effect. *Id.* at 17 n. 52. The mill of Kaiser Pipe and Casing in Fontana, California ceased production in mid–1986, and remained closed pending an engineering study to determine the required capital investment to renovate the facility. *Id.* at n. 54. Finally, the work stoppage at USX brought production at the mill in Provo, Utah to a halt. *Id.* at 11, 17.

The Court finds it reasonable for the Commissioners to discount an increase in imports when they found, based upon the evidence in the record, that the increase in Canadian imports is attributable to the closing of pipe mills in the western United States for reasons unrelated to imports.

## CONCLUSION

This matter is remanded to the Commission for further consideration consistent with this opinion. The Commission shall file its decision on remand within 30 days. Plaintiffs will have 20 days after receipt of the decision on remand to respond. Defendants and defendant-intervenors may reply within 10 days of receipt of the plaintiffs' response.