**USX CORPORATION, f/k/a United States Steel Corporation, Plaintiff,**

v.

**The UNITED STATES and United States International Trade Commission, Defendants,**

and

**Propulsora Siderurgica, S.A.I.C., Defendant–Intervenor.**

**Court No. 85–03–00325.**

United States Court of International Trade.

Sept. 16, 1988.

USX Corp., John J. Mangan, J. Michael Jarboe, Craig D. Mallick and Robin K. Capozzi, Pittsburgh, Pa., for plaintiff.

Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel and Timothy M. Reif, U.S. Intern. Trade Com'n, Washington, D.C., for defendants.

Mudge, Rose, Guthrie, Alexander & Ferdon, David P. Houlihan, Jeffrey S. Neeley, New York City, for defendant-intervenor.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiff, USX Corporation, brings this action challenging the final determination of the United States International Trade Commission (ITC) that an industry in the United States was neither materially injured nor threatened with material injury by reason of imports of cold-rolled carbon steel plates and sheet from Argentina that were sold at less than fair value. *Cold-Rolled Carbon Steel Plates and Sheets from Argentina*, Inv. No. 731–TA–175 (May 1988) (Remand II).

Before the court are the results of the second remand in this action. In the court's previous opinion, *USX v. United States*, 12 CIT ——, 682 F.Supp. 60 (1988), the action was remanded to ITC because two of the four opinions comprising the majority were found to be legally flawed and not based on substantial evidence in their analysis of causation. The court also directed ITC to address further the issue of cumulation, specifically regarding imports from Brazil and Korea.[1,2] Each of these issues will be discussed separately.

---

1. The court held that Mexican, Spanish and South African imports need not be cumulated with Argentine imports.

2. The court found no significant errors in ITC's negative determination regarding threat of material injury.

## DISCUSSION

### I. CUMULATION

■ Prior to the Trade and Tariff Act of 1984, the cumulation of imports was discretionary and ITC could decide properly not to cumulate where the subject imports exhibited different trends in the U.S. market distinct from those of other countries imports or where other conditions of trade indicated that cumulation would be inappropriate. *USX v. United States*, 11 CIT ——, ——, 655 F.Supp. 487, 491–92; *Lone Star Steel Co. v. United States*, 10 CIT ——, ——, 650 F.Supp. 183, 186–87 (1986).

In the present case, ITC has based its decision not to cumulate imports of Brazil and Korea with those of Argentina on differing trends in import volume, insufficient similarities in pricing patterns and limited geographic overlap in the markets served by the imports.[3] Plaintiff agrees that prior to 1984 such distinctions could justify a decision not to cumulate when properly employed, but argue that a finding of divergent trends among these imports is not supported by the record in this case and that ITC's failure to cumulate imports from Brazil and Korea with those of Argentina

was arbitrary, capricious and an abuse of discretion.[4]

In its discussion of import volume trends, ITC notes that Argentine imports retained an essentially flat market share during the period of investigation while Brazilian and Korean imports increased their market share significantly during the same period.[5] Thus, Argentine imports were actually losing position relative to other importing countries during the period.[6] This observation is clearly substantiated in the record. *See* Remand I at A–7.

The record also supports ITC's finding that pricing patterns of Argentine imports show only limited similarity with those of Brazil and Korea. In the supplemental report to the first remand determination, ITC staff states that "[w]hile all of the price indexes are positively correlated, the Argentine prices are less highly correlated with those of the other three countries [Brazil, Korea and South Africa] and not in a statistically significant manner than are the prices of those countries with each other." Remand I at A–10; *see id.* at A–11.

Finally, the record confirms ITC's conclusion that there is little geographic overlap between U.S. markets served by Argentina

---

**3.** In ITC's first remand determination, *Cold-Rolled Carbon Steel Plates and Sheets from Argentina*, USITC Pub. No. 1967, Inv. No. 731–TA–175 (March 1987) (Remand I), two members of the majority based their decisions not to cumulate Korean imports on such differing trends. One commissioner treated Brazilian imports in the same manner. In Remand II, all the commissioners who voted based their decision on Brazilian and Korean imports on such analysis. One commissioner declined to act on the remand order because he was not on the Commission at the time of the original decision. Although this had no effect on the outcome, remand is made to the entire Commission. The Commission, rather than individual commissioners, acts.

**4.** Plaintiff makes much of ITC's statement in the supplemental staff report to Remand I that "[i]n general, imports of such cold-rolled sheets from all sources compete for the same customers, e.g., service centers, and have a simultaneous impact in the U.S. market." Remand I at A–8. While this general statement confirms the fungibility of Argentine cold-rolled sheet with that imported from other countries, it does not, standing alone, contradict ITC's findings regard-

ing disparate trends. The data discussed in the text, on the other hand, supports the determination.

**5.** After rising steadily from 1981–1983, Brazilian imports did decline slightly during the first three quarters of 1984. This reduction may have been linked to a suspension of liquidation of Brazilian imports which took effect in November 1983.

**6.** In its opinion reviewing the original determination, the court did express concern that Argentina's import volume trends may have been affected by the initiation of the antidumping investigation and subsequent suspension of liquidation. That concern was significant because of ITC's inadequate discussion of the significance of import volume and failure to cite any trends or market conditions which would support its decision not to cumulate. *USX*, 11 CIT at ——, 655 F.Supp. at 492. These inadequacies have been rectified in the current determination. Furthermore, the initiation of this investigation and suspension of liquidation, both of which occurred in early 1984, are not likely to have affected Argentine import trends for the entire 1981–84 period.

and Korea and that the geographic concentration of the imports of Argentina and Brazil differs significantly. *See* Remand I at A–8 and A–9.

In light of this evidence, the court finds that ITC acted within its discretion in not cumulating Argentine imports with those from Brazil and Korea.

## II. CAUSATION

In the determination presently before the court, the two commissioners whose causation analyses the court previously found insufficient concur with the two remaining members of the majority who utilize a traditional approach to causation analysis. That causation analysis, which was set forth in its entirety in Remand I, is now the subject of review.

Under a traditional approach to causation analysis, ITC closely follows the statutory outline and focuses its attention on the volume of imports of the subject merchandise, the effects of those imports on prices of United States like products, and the impact of those imports on domestic producers of like products. 19 U.S.C. § 1677(7)(B) (1982). In evaluating each of these factors, ITC considers various indicators which are set forth at 19 U.S.C. § 1677(7)(C) (1982).[7]

Initially it should be noted that Congress has vested ITC with considerable discretion as to the weight it will assign a given factor in making its injury determination. *Copperweld Corp. v. United States*, 12

CIT ——, ——, 682 F.Supp. 552, 564 (1988); *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). As Congress has explained:

> The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide.

S.Rep. 249, 96th Cong. 1st Sess. 88, *reprinted in* 1979 U.S.Code Cong. & Admin. News 381, 474.

In reviewing ITC's determination, it is not this court's function to decide that, were it ITC, it would have made the same decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984). This court must sustain a final negative injury determination by ITC unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).

### A. Import Volume

■ Plaintiff argues that ITC's analysis of import volume must be rejected because it fails to address certain concerns raised by the court in its review of the original ITC determination. In that opinion, the

---

**7.** The statutory indicators are set forth as follows:

**(C) Evaluation of volume and of price effects**
For purposes of subparagraph (B)—
**(i) Volume**
  In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.
**(ii) Price**
  In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—
    (I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.
**(iii) Impact on affected industry**
  In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—
    (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
    (II) factors affecting domestic prices, and
    (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

court stated that "it is the *significance* of a quantity of imports and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." *USX*, 11 CIT at ——, 655 F.Supp. at 490 (citing *Atlantic Sugar, Ltd. v. United States*, 2 CIT 18, 23, 519 F.Supp. 916, 921–22 (1981)). The court rejected ITC's analysis of market penetration data which consisted solely of the statement that levels of market penetration remained low and stable, without discussing the significance of this trend or its relationship to other facts uncovered in the investigation. *Id.* This lack of explanation occurred against the setting of a flawed cumulation decision which further obscured any valid reasoning.

The court finds that ITC's causation analysis now addresses the significance of Argentine import volumes and sufficiently explains its views on market penetration while correcting other errors. While ITC once again places considerable emphasis on import volume, it analyzes the relationship of import volume to conditions and trends in the marketplace. Rather than relying on conclusory statements, ITC has placed volume data in a proper context.

Specifically, ITC emphasizes that although the absolute volume of Argentine imports rose during the period of investigation, market share data indicates that Argentine imports were growing no faster than the overall growth in the market. Remand I at 65. This fact is illustrated by the level import penetration ratios for Argentine imports during the period of investigation. Remand I at A–7. ITC notes that while this is not determinative, it is "clearly a very important fact." Remand I at 65.

The statute specifies that in evaluating the volume of imports, ITC "shall consider whether the volume of imports of the merchandise, or any increase in that volume, *either in absolute terms or relative to production or consumption* in the United States, is significant." 19 U.S.C.

§ 1677(7)(C)(i) (1982) (emphasis added). "This language when read in conjunction with the legislative history indicates that disjunctive language was chosen to signify congressional intent that the agency be given broad discretion to analyze import volume in the context of the industry concerned." *Copperweld Corp. v. United States*, 12 CIT ——, ——, 682 F.Supp. 552, 570 (1988); *see* S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 474.[8]

In focusing its attention on the relative share of the domestic market held by Argentine imports, ITC fulfilled its statutory duty to analyze the volume of imports in either an absolute or relative sense depending upon what is appropriate under the circumstances. ITC's preference for relative import data here, as opposed to volume increases in absolute terms, given the increase in domestic consumption, was reasonable. *Copperweld*, 12 CIT at ——, 682 F.Supp. at 570. ITA related import data to improving conditions in the domestic market and other conditions of trade. All of this is analyzed after proper focus on the relationship to imports from other sources.

### B. Pricing and Price Effects

In its analysis of pricing and price effects of Argentine imports, ITC acknowledged that it confirmed several instances of underselling, but decided to give this evidence limited weight due to the relatively small number of comparisons made, the limited number of transactions on which each comparison was based, and the fact that certain product and quality differences exist between the Argentine and domestic product. Remand I at 68.

Plaintiff challenges this analysis, arguing that ITC has "inexplicably" discounted and diminished uncontroverted evidence of underselling and that "[i]n an investigation of a highly fungible product, evidence of increasing import volumes and consistent

8. The legislative history states in relevant part: It is expected that in its investigation the Commission will continue to focus on the conditions of trade, competition, and development regarding the industry concerned. For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant.

underselling 'are evidence of lost sales and revenues due to imports and, more particularly, lost sales due to pricing.' *Lone Star Steel Co. v. United States*, 10 CIT ——, 650 F.Supp. [183] 185, 186 (1986)." Plaintiff's Brief, Ex. 1 at 24–25.

■ As indicated, *supra*, it is within ITC's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis. *Maine Potato*, 9 CIT at 300, 613 F.Supp. at 1244. The court finds it reasonable for ITC to give less weight to evidence of underselling when the sample from which the conclusion of underselling is drawn is relatively small.

ITC observes that Argentine import prices were raised roughly 10–15 percent in the beginning of 1984, before any ITC action on the petition. ITC states that this pricing behavior was "particularly passive in view of the price sensitivity ... of cold rolled sheet," and the fact that these "price escalations occurred even though Argentina was merely maintaining a stable market penetration of less than 1%, and was actually losing position relative to other importing countries." Remand I at 50. Although domestic prices rose during the same period, they rose to a lesser extent. *See* Confidential Record Document Number (CR) 9A at A–32. Thus, the domestic price rise does not detract significantly from the conclusion that Argentina acted benignly in the marketplace.

■ The court rejects plaintiff's contention that evidence of underselling when combined with evidence of increasing import volumes necessarily indicates injury due to pricing in cases involving fungible products such as steel. The significance of the various factors affecting an industry depends on the facts of each case. In *Lone Star Steel*, the case cited by plaintiff in support of this argument, the court found that under certain conditions of trade evidence that sales were lost to lower priced

imports existed apart from any specifically confirmed example. One of the conditions of trade noted was that U.S. demand for oil country tubular goods was decreasing during the period of investigation. *Lone Star Steel*, 10 CIT at ——, 650 F.Supp. at 186. This stands in contrast to the present case in which consumption was rising during the period of investigation. In any case, the court sustained the negative decision in *Lone Star Steel* because the court did not find that evidence of lost sales mandated an affirmative finding and other evidence supported the negative conclusion. Furthermore, in this case ITC cites the additional factors of lack of direct competition with the domestic industry because of product and quality considerations. Remand I at 68; *see id.* at A–12 and 14, CR 17 at 17 and 21.

### C. Lost Sales and Revenue Allegations

■ Finally, in evaluating the impact of Argentine imports on the U.S. industry, ITC looked at allegations of lost sales and revenue. In its review of ITC's original determination, the court criticized ITC's determination for its reliance upon instances of lost sales and revenue in light of the agency's admitted failure to investigate a number of lost sales and revenue allegations. *USX*, 11 CIT at ——, 655 F.Supp. at 491.[9]

ITC has now pursued these remaining allegations. Remand I at A–10–15; CR 17 at 15–23. From this information ITC concludes that "there was little direct competition between Argentine and domestic steel in the relevant period [and that] Argentine steel was not being marketed aggressively with the domestic product." Remand I at 69. Furthermore, ITC notes that "most of the allegations, with the exception of some very small tonnages, were not confirmed or involved much smaller amounts or very different prices than were alleged." *Id.* The court finds that this evidence supports ITC's conclusions. The totality of the evi-

---

9. In that opinion, the court faulted ITC for failing to investigate "four of seven allegations of lost sales and all three reported instances of lost revenue." *USX*, 11 CIT at ——, 655 F.Supp. at 491. There was some confusion caused by the earlier staff report; it now appears that USX submitted five allegations of lost sales and two allegations of lost revenue. Remand I at A–10, 12. The significance of the failure to investigate is the same, however.

dence cited by ITC in support of its determination on remand leads the court to the conclusion that it is compelled under the standards established by binding precedent to conclude that the determination is supported by substantial evidence.

In summary, the court finds that ITC's determination that an industry in the United States is not materially injured by reason of imports of the subject merchandise to be supported by substantial evidence and otherwise is in accordance with law.

### JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiff's motion for judgment based upon the administrative record is denied and this action is hereby dismissed.