TRENT TUBE DIVISION, CRUCIBLE MATERIALS CORPORATION; Armco–Specialty Steel Division; Damascus Tubular Products; Allegheny Ludlum Corporation; Carpenter Technology Corporation; and United Steelworkers of America, AFL–CIO–CLC, Plaintiffs,

v.

UNITED STATES, Defendant,

and

Avesta Sandvik Tube AB and Avesta Stainless, Inc., Defendant–Intervenors.

No. 87–12–01189.

United States Court of International Trade.

June 20, 1990.

Collier, Shannon, Rill & Scott (David A. Hartquist, Patrick B. Fazzone, Kathleen Weaver Cannon, Mary T. Staley and Nicholas D. Giordano, Washington, D.C.) for plaintiffs.

Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, Office of the General Counsel, U.S. Intern. Trade Com'n (Timothy M. Reif and William T. Kane, Washington, D.C.) for defendant.

Freeman, Wasserman & Schneider (Jack Gumpert Wasserman and Patrick C. Reed, New York City) for defendant-intervenors.

## OPINION AND ORDER

CARMAN, Judge:

Plaintiffs seek review of the final determination of the United States International Trade Commission (hereinafter Commission or ITC) that an industry in the United States is not materially injured by reason of imports of welded stainless steel pipe and tubes from Sweden. *See Stainless Steel Pipes and Tubes from Sweden,* USITC Pub. No. 2033, (Final) (Nov.1987) (hereinafter ITC Pub.2033). Notice of the ITC's final determination was published in 52 Fed.Reg. 45,256 (Nov. 25, 1987). Plaintiffs contend that three of the five Commissioners reached this negative determination in a manner which was unsupported by substantial evidence on the record and otherwise not in accordance with law.

## BACKGROUND

In October of 1986, the Specialty Tubing Group filed a petition with the Commission and the Department of Commerce (hereinafter Department or Commerce) alleging that the industry in the United States producing welded and seamless stainless steel pipe and tube was materially injured or threatened with material injury by reason of imports from Sweden sold at less than fair value. While the Commission decided that the domestic industry producing welded stainless steel pipe and tubing was "still

suffering material injury," it determined by a 3–2 vote that "there [was] no material injury by reason of [less than fair value] imports of welded pipe and tube from Sweden." ITC Pub. No. 2033 at 17.[1]

## CONTENTIONS OF THE PARTIES

*Plaintiffs' Contentions*

Plaintiffs make the following contentions:

(1) Chairman Liebeler erred in her determination:

(a) by basing her determination exclusively on the five factor test for determining causation which originated in *Certain Red Raspberries from Canada*, USITC Pub. No. 1707 at 11–19 (Final) (June 1985) (Additional Views of Vice Chairman Liebeler) (hereinafter ITC Pub. 1707);

(b) by failing in her causation analysis to address any of the factors outlined in 19 U.S.C. § 1677;

(c) by failing to provide any explanation for her findings with respect to import penetration, price trends and product homogeneity; and

(d) by premising her pricing analysis on a search for predatory intent.

(2) Vice Chairman Brunsdale erred in her determination:

(a) by basing her negative causation determination on an estimate of elasticity of supply in the domestic welded stainless steel pipe and tube industry that was based on elasticity estimates that were seriously outdated and not demonstrably relevant to the industry under investigation;

(b) by failing to provide an explanation for certain key elements of her negative causation determination;

(c) by failing to address certain factors related to causation outlined in 19 U.S.C. § 1677; and

(d) by identifying the causation standard as a question of whether the imports were a material cause of injury and failing to relate the imports to the indicia of injury suffered by the domestic industry.

(3) Commissioner Rohr erred in his determination:

(a) by identifying the causation standard as whether imports were a material cause of injury;

(b) in his analysis of the volume effect of the imports by failing to relate his causation determination to the indicia of material injury found by the Commission and by failing to address certain indicators of causation that the ITC was required to consider; and

(c) in his analysis of the price effect of the imports concerning import volume;

(d) failing to consider price suppression; and

(e) by dismissing overwhelming evidence of price underselling.

*Contentions of Defendant ITC and Defendant–Intervenors*

The ITC and defendant-intervenors contend that the ITC's determination was reasonable, supported by substantial evidence on the record and in accordance with law.

## STANDARD OF REVIEW

In reviewing a final injury determination of the ITC, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). When applying the substantial evidence standard "[t]he court may not substitute its judg-

---

1. The Commission determined that seamless and welded stainless steel pipe and tubing were two separate like products. The Commission found that the seamless industry was materially injured by imports of stainless steel pipe and tube from Sweden. This determination was affirmed by *Sandvik AB v. United States*, 13 CIT ——, 721 F.Supp. 1322 (1989), *aff'd per curiam*, 904 F.2d 46 (Fed.Cir.1990).

ment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* ....' " *American Spring Wire Corp. v. United States*, 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984) (quoting *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465), *aff'd sub nom. Armco, Inc. v. United States*, 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985).

## CHAIRMAN LIEBELER

### *Five Factor Test*

■ Plaintiffs contend that Chairman Liebeler erred by basing her determination exclusively on the five factor test and by failing to address any of the factors outlined in 19 U.S.C. § 1677. The Commissioner's five factor test considers (1) import penetration data; (2) high margin of dumping or subsidy; (3) homogeneity of the products; (4) evidence of declining domestic prices; and (5) barriers to entry (foreign supply elasticity). ITC Pub.2033 at 29–32. In applying the test to the investigation of stainless steel pipes and tubing from Sweden, Chairman Liebeler found: (1) import penetration to be low; (2) a moderate to high margin of dumping; (3) mixed evidence of homogeneity of product; (4) more or less steady domestic prices; and (5) an absence of barriers to foreign entries. *Id.*

Statutory requirements for the Commissioners to consider in making their determinations concerning material injury are set out in 19 U.S.C. § 1677(7)(B) and (C). These sections read in pertinent part as follows:

**(B) Volume and consequent impact**

In making its determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b) of this title, the Commission shall consider, among other factors—

(i) the volume of imports of the merchandise which is the subject of the investigation,

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

**(C) Evaluation of volume and of price effects**

For purposes of subparagraph (B)—

**(i) Volume**

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

**(ii) Price**

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

**(iii) Impact on affected industry**

In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C. § 1677(7)(B) and (C) (1982).

In her Additional Views, the Chairman stated:

The statute requires the Commission to examine the volume of imports, the effect of imports on prices, and the general

impact of imports on domestic producers. The legislative history provides some guidance for applying these criteria. The [five] factors incorporate both the statutory criteria and the guidance provided by the legislative history. Each of these factors is evaluated in turn. ITC Pub. 2033 at 28.

In comparing Chairman Liebeler's test with the statute it appears that while some of the requisite factors in section 1677(7)(B) and (C) have been addressed, others have not. For example, concerning section 1677(7)(B), it is obvious that she considered the volume of imports in coming to her conclusion of low import penetration. She also considered the effects of imports on United States prices when she concluded that domestic prices remained more or less steady. As for the impact of imports on domestic producers, that may have been a factor in the Chairman's evaluation of homogeneity of the product.

Turning to the evaluation of relative factors outlined in section 1677(7)(C), plaintiffs contend that factors included in section (iii)—"Impact on affected industry"—were not considered by Chairman Liebeler in reaching her determination. In *Copperweld Corp. v. United States*, 12 CIT ——, 682 F.Supp. 552 (1988), plaintiffs contended that Chairman Liebeler substituted the five factor test for the statutory requirements of section 1677(7). The discussion of Chairman Liebeler's five factor test in *Copperweld*, appeared in a footnote to the plurality opinion. The footnote stated that the Chairman found the five factors to be "particularly helpful on the issue of causation." *Copperweld*, 12 CIT at ——, 682 F.Supp at 567. The court determined that these five factors were not substituted for the factors contained in section 1677 and that it was rational to conclude that the footnote was incidental to the views outlined in the plurality opinion. *Id.* In the instant case, Chairman Liebeler joined in the majority opinion, which found "material injury," but the majority determined that "there [was] no material injury by reason of [less than fair value imports] of welded pipe and tube from Sweden." ITC Pub. No. 2033 at 17. However, each Commissioner discussed causation in his or her separate Additional Views and it is clear that Chairman Liebeler's causation theory was based upon her five factor test.

In *USX Corp. v. United States*, the court examined the five factor test as applied by Chairman Liebeler in a situation where she concluded that the existence of (1) relatively high dumping margins, (2) substitutable imported and domestic product and (3) downward pricing trends were "outweighed by the absence of barriers to entry, and the fact that cumulated import penetration [was] very low, which strongly suggest[ed] the absence of unfair price discrimination." 12 CIT ——, 682 F.Supp. 60, 64 (1988). The court examined the absence of barriers to entry and low import volume, concluding that the relationship between import volume and injury was unexplained. The court then looked at the absence of barriers to entry and found that Chairman Liebeler was equating unlawful dumping with a form of unfair price discrimination as set out in *Certain Red Raspberries from Canada*, USITC Pub. 1707, 14–15. *Id.* at 65. *Red Raspberries* was the decision where the Chairman originated her five factor theory and is cited as such in the instant investigation. ITC Pub. 2033 at 27 n. 12. The court in *USX* found two flaws in the Chairman's position. First, "this view necessarily makes the intent of a foreign producer the focus of the ITC causation inquiry. Another, but not unrelated flaw, is that this view seems to assume that the purpose of the antidumping statute is to prevent a particular type of 'injury to competition' rather than merely material 'injury to industry.' " *USX*, 12 CIT at ——, 682 F.Supp. at 65. In conclusion the court noted that:

> Thus, contrary to the suggestion in defendants' brief, what occurred in this case is not the mere incorporation of another relevant economic factor into a causation analysis as is clearly permissible under 19 U.S.C. § 1677(7)(B)–(C). Instead, the nature of the reliance on the barrier to entry factor has worked to change the focus of the injury investiga-

tion in a manner not permitted by Congress.

*USX*, 12 CIT at ——, 682 F.Supp. at 68.

After a careful review of the five factors and Chairman Liebeler's application of these factors to the investigation in question, it appears that she has failed to examine the factors outlined in section 1677(7)(C)(iii). It is also unclear whether or not the Chairman considered the impact of the Swedish imports on domestic producers as set out in section 1677(7)(B)(iii). Since these factors have not been examined as they must be to comply with the statute, the Court holds that Chairman Liebeler's determination is not supported by substantial evidence on the record and is not in accordance with law. Therefore, her determination is remanded with instructions to evaluate the investigation in relation to the factors outlined in section 1677(7)(C)(iii) and section 1677(7)(B)(iii).

## VICE CHAIRMAN BRUNSDALE

### Elasticity Model

■ Plaintiffs' main contention is that Vice Chairman Brunsdale based her elasticity model on outdated studies, specifically a study of the iron and steel industry as a whole conducted in the 1970's that contained data going back to the 1950's. Plaintiffs claim that applying this data to the welded and stainless steel pipe industry in 1986 was neither time nor product specific. They also maintain that the use of old data was specifically rejected in two recent cases, *USX* and *Maverick Tube Corp. v. United States*, 12 CIT ——, 687 F.Supp. 1569 (1988).

The ITC and defendant-intervenors contend that plaintiffs agreed to the use of the number ten as elasticity estimate of domestic supply. This figure was arrived at based on information obtained by the Commission during its investigation and the figure was set out in a posthearing memorandum from the Office of Economics to the Commission. The memo stated that the "petitioners agreed with this estimate citing low capacity utilization rates for the domestic industry, the virtual absence of alternative markets, and the inability of

domestic tubular producing operations to shift toward other products in the short run." Administrative Record Document (hereinafter A.R.) 110 at 6 (Memorandum EC–K–437, Nov. 5, 1987). The memorandum also stated that "the elasticity of domestic supply for stainless steel pipes and tubes was estimated to be highly elastic, at greater than ten." *Id.* The ITC and defendant-intervenors contend that plaintiffs are estopped from raising this issue of the elasticity number since they did not object to it at the administrative level.

In *USX* and *Maverick Tube*, the court examined elasticity estimates and found them to be flawed. *USX*, 12 CIT at ——, 682 F.Supp. at 70; *Maverick Tube*, 12 CIT at ——, 687 F.Supp. at 1575. In discussing the reliability of elasticity estimates in general, the court in *USX* stated:

> As in *Alberta Pork*, [11 CIT 563, 669 F.Supp. 445 (1987)] this court does not require that ITC establish the accuracy of elasticity estimates to a scientific degree of certainty before they may be used, but this does not preclude a requirement that some threshold degree of reliability be established in the record if commissioners are to rely almost exclusively on such estimates in fulfilling their statutorily mandated task.

*USX*, 12 CIT at ——, 682 F.Supp. at 69.

In *USX* and *Maverick Tube*, use of the same elasticity estimate of 3.5 was at issue. The estimate was rejected first in *USX* and then shortly thereafter in *Maverick Tube*. *Maverick Tube*, 12 CIT at ——, 687 F.Supp. at 1574–75. In these two cases, unlike the instant case, "expert testimony and adversarial participation in the administrative process" did not take place. *Maverick Tube*, 12 CIT at ——, 687 F.Supp. at 1575. The "estimate was applied in this preliminary determination [*Maverick Tube*] without opportunity for the parties to comment or present evidence on its reliability." *Id.*

Plaintiffs contend that the use of old and nonspecific data was the basis of the rejection of Vice Chairman Brunsdale's elasticity estimate in *USX* and *Maverick Tube* and

that her estimate in the instant case should be rejected on the same grounds. In those two cases, the court determined there was "no support in th[e] record to establish the reliability of the underlying data compiled decades ago." *Maverick Tube*, 12 CIT at ——, 687 F.Supp. at 1575. The court also noted that the record did not contain evidence that the specific items under investigation were described by the estimates. *Id.*

The ITC contends that the data were neither old nor nonspecific. At oral argument, The ITC stated that the outmoded figure plaintiffs were critical of was not relied on by the Vice Chairman in her determination. The ITC said that the pre-hearing and post-hearing memoranda indicated that nonspecific industry data were not used by the Vice Chairman. Specifically, the ITC pointed to post-hearing memorandum EC–K–437 from which the number ten came. In its post-argument brief, the ITC notes that while a pre-hearing memorandum by the Office of Economics cited to a study by J. David Richardson and John H. Mutti, entitled "Industrial Displacement Through Environmental Controls: The International Competitive Aspects," the post-hearing memorandum made no mention of the study. *See* Defendant's Submission Concerning Elasticity Estimate of Vice Chairman Brunsdale (hereinafter Defendant's Elasticity Submission) at 5–6; A.R. 86 at 2 n. 1 (Memorandum EC–K–398, Oct. 9, 1987). Since the Vice Chairman cites only to the post-trial memorandum when discussing the elasticity estimate and since she notes that the estimate of the Office of Economics on which she relies "incorporates comments and evaluations offered by parties in this case" the ITC claims that she relied on only the post-hearing memorandum for her elasticity estimate. Defendant's Elasticity Submission at 5–6; ITC Pub. 2033 at 43 n. 6.

The Court holds that Vice Chairman Brunsdale's elasticity estimate was based on substantial evidence and was in accordance with law. Unlike the estimate used in *USX* and *Maverick Tube*, input was requested and received from the parties involved and the plaintiffs specifically agreed to the use of the elasticity estimate put forth by the Office of Economics. There is no reference to the Richardson and Mutti study in the post-hearing memorandum upon which the Vice Chairman relied. In fact, another figure of 16.24 was discussed and dismissed as inappropriate since "the technique used in estimating [that figure was] somewhat upwardly biased." A.R. 86 at 2 n. 1. As to plaintiffs' contentions that the estimate was based on non-specific industry information, the Vice Chairman looked to such factors as the low capacity utilization rate for domestic producers as well as the lack of alternative markets for these producers and their limited ability to switch to manufacturing different products in determining her estimate. ITC Pub. 2033 at 47–48.

In describing the relationship between her negative determination and her elasticity estimate, the Vice Chairman stated that if the elasticity of domestic supply was at least 10, then "if the average domestic price obtained by U.S. producers rises by 1 percent, other things remaining the same, quantity supplied by domestic firms would increase by at least 10 percent." ITC Pub. 2033 at 43. She then applied this relationship between quantity and price to the volume and price in the instant investigation. She stated, "[s]ince domestic shipments were at most 4.3 percent lower [because of Swedish imports] and since the supply elasticity is greater than 10, price suppression/price depression would be, *at most,* 0.43 percent (that is, 4.3 percent divided by 10)." ITC Pub. 2033 at 45 (emphasis in original). The Vice Chairman, therefore related her estimate to a finding of price suppression and price depression as outlined in 19 U.S.C. § 1677(7)(C)(ii)(II). This evidence of price suppression and depression was used along with evidence of the volume of imports to find the maximum possible revenue loss for domestic firms on account of the Swedish imports. ITC Pub. 2033 at 45–46. Revenue loss is a measure of "the impact of imports ... on domestic producers...." as noted in 19 U.S.C. § 1677(7)(B)(iii).

During oral argument, plaintiffs contended that the case law established by *USX* and *Maverick Tube* allow for the reevaluation of Vice Chairman Brunsdale's elasticity model, despite the fact that their economist agreed with the estimate at the administrative level. Transcript of Oral Argument at 35–36. The ITC cites *Kokusai Elec. Co., Ltd. v. United States*, 10 CIT 166, 171–72, 632 F.Supp. 23, 28 (1986) and *Empire Plow Co., Inc. v. United States*, 11 CIT 847, 675 F.Supp. 1348, 1354 (1987) to stand for the proposition that plaintiffs are estopped from reversing their position and raising this issue on appeal. The Court finds that to allow plaintiffs to change their position at this time would deny the Commission the opportunity to review plaintiffs' arguments during the time period prescribed by statute as well as deprive the other parties of their right to respond to plaintiffs' position.

### Explanation of Analysis

■ Plaintiffs further contend that Vice Chairman Brunsdale did not explain her analysis of her negative causation determination. At oral argument, the ITC stated that the Vice Chairman "took a step-by-step approach, calculating maximum loss of shipments, and on the basis of that elasticity of supply figure, calculating the maximum declining price." Transcript of Oral Argument at 56. Defendant-intervenors contend that there were three reasons why it was easy for United States producers to increase their domestic shipments of stainless steel welded pipes and tubes in response to a price increase: low capacity utilization rates were in effect, there was a lack of other available markets, and the producers were unable in the short run to shift to manufacturing products other than stainless steel welded pipes and tubes.

The Vice Chairman's views indicate that she examined "the maximum possible adverse effects on domestic prices and volume" and "considered first the absolute and relative amounts of the subject imports." ITC Pub. 2033 at 42. She then applied the elasticity model after making two assumptions: "[f]irst ... that the total size of the market was little affected by the lower price of the dumped pipe and tube," and "[s]econd ... that the total volume of the dumped imports replaces an equal volume of domestic shipments on a one-for-one basis." *Id.* at 44. She then found that the volume effect in 1986 when imports were greatest would have caused a contraction in domestic industry shipments of 4.3 percent and price suppression/price depression of 0.43 at most. *Id.* at 45. Vice Chairman Brunsdale then concluded with her discussion of material injury and lost revenues as outlined below in the Court's discussion of the causation standard.

Based upon her additional views it is apparent to the Court that the Vice Chairman explained her analysis and conclusion that dumped imports of Swedish stainless steel welded pipe and tube were not a cause of material injury to the domestic industry. Her explanation was supported by substantial evidence on the record and was otherwise in accordance with law.

### Failure to Consider Statutory Factors

■ Plaintiffs contend that Vice Chairman Brunsdale failed to consider the effect of Swedish imports on factors such as industry profits, productivity, return of investment, capacity utilization, cash flow, inventories, employment, wages, growth, ability to raise capital or cash flow and investment levels and trends. Defendant-intervenors note that the Vice Chairman's analysis of these section 1677(7)(C)(iii) factors appears at footnote 66 of the majority opinion under the heading "Condition of the Domestic Industry." ITC Pub. 2033 at 17 n. 66. The footnote reads as follows:

Vice Chairman Brunsdale has severe reservations about the finding that domestic industry is materially injured. She notes, for example, that production, shipments, capacity, number of employees, hours worked, and net sales of the domestic industry were relatively unchanged over the period of investigation. Report at A–31 (Table 2), A–33 (Table 3), A–42 (Table 7), A–52 (Table 12). While the Vice Chairman does not find that the domestic industry is materially injured, she assumes *arguendo* that it is and

considers the issue of causation in her Additional Views, *infra.*

*Id.*

In addition, the majority opinion states that "employment, hours worked, wages paid, and total compensation also declined" during the investigation period. *Id.* at 17.

As the court stated in *Gifford–Hill Cement Co. v. United States,*

First, the Commission is charged only with rationally considering impact on the domestic industry in light of the relevant factors in each case. 19 U.S.C. § 1677(7)(C)(iii)(I) (1982). Second, "the Commission is not required to issue findings and conclusions on an issue concerning a statutory element simply because it was presented by the petitioner." *Jeannette Sheet Glass Corp. v. United States,* 9 CIT 154, 607 F.Supp. 123, 130 (1985) [citations omitted]. "Absent a showing to the contrary, the Commission is presumed to have considered all the evidence in the record." *Jeannette,* 607 F.Supp. at 130.

9 CIT 357, 369–70, 615 F.Supp. 577, 587 (1985).

In *Gifford–Hill,* the court reasoned that since data concerning the challenged factors were in the record, " 'the Commission must be presumed to have considered them.' " 9 CIT at 370, 615 F.Supp. at 587 (quoting *Jeannette,* 9 CIT at 162, 607 F.Supp. at 130). In the instant case, the Court holds that data concerning the contested factors were included in the record and it therefore must be presumed that the Commission considered these factors.

*Causation Standard*

■ Plaintiffs further contend that Vice Chairman Brunsdale erroneously identified the causation standard as a question of whether imports were a material cause of injury. The Vice Chairman concluded that the overall combined volume and price effects of the subject imports was 4.7 percent which was too small to be material. ITC Pub. 2033 at 45–46. The paragraph following this conclusion states that "[a] realistic assessment of the degree to which the dumped imports reduced domestic shipments, prices, and industry revenue is smaller than the maximum relative magnitudes presented above. There are three reasons why this is so." *Id.* at 46. At that point, Vice Chairman Brunsdale went on to discuss that: (1) she had ignored the fact that there were other countries that supplied stainless steel welded pipe and tube to the domestic market; (2) she had ignored the fact that domestic and Swedish pipe and tube were not perfect substitutes for one another; and (3) she had assumed to this point that the price advantage the dumping conferred on the Swedish imports was so large that the entire amount of the Swedish imports could be attributed to the act of dumping. *Id.* at 46–48.

The Vice Chairman then explained that if the full dumping margin of 34.5 percent were passed through to the price of Swedish pipe and tube sold in the domestic market, that price in the United States would be lowered by about 25 percent. She contended, however, it would not have been likely that the Swedish dumping would have produced an adverse effect to the domestic industry of anything near the maximum 4.3 percent volume effect described above. Without the unfair advantage, the resulting decline in imports from Sweden would have been replaced to some extent by imports from other countries and the Swedes would have shipped pipe and tubing to other countries as well. As other countries saw their markets absorbing more Swedish product, these countries would have switched to more attractive markets elsewhere, including more shipments to the United States. Vice Chairman Brunsdale contended that after allowing for the shifting of foreign suppliers, the total amount of pipe and tubing imports coming into the United States would most likely not be very much lower and that even if these imports were lower, they would not fall by the amount of Swedish imports which were diverted from the United States market to other markets. She then concluded that "in order to properly assess the effects of dumped imports from Sweden on domestic firms, it is necessary to allow for the supply responses by other countries if Sweden's imports were re-

moved from the domestic market. When this is done the adverse effect of dumped imports on domestic shipments will be less, possibly considerably less, than 4.3 percent." *Id.* at 50.

The Vice Chairman discussed material injury in terms of lost revenues. · Since the Vice Chairman has discretion in making her determination, and the Court finds that her approach was not unreasonable, the Court holds that Vice Chairman Brunsdale's determination was supported by substantial evidence and otherwise in accordance with law.

*Imports and Domestic Injury*

■ Plaintiffs also contend that Vice Chairman Brunsdale failed to relate imports to the indicia of injury suffered by the United States industry. The Vice Chairman's analysis of lost revenue and material injury as outlined above indicates her views on the relationship between imports and injury caused by these imports in the domestic market.

Based upon the foregoing, the Court holds that Vice Chairman Brunsdale's determination, including her use of the elasticity model, was supported by substantial evidence on the record and otherwise in accordance with law.

## COMMISSIONER ROHR

Plaintiffs contend that Commissioner Rohr erred in his determination by (a) identifying the causation standard as whether imports were a material cause of injury; (b) failing to relate his causation determination to the indicia of material injury and failing to address certain indicators of causation; (c) coming to an incorrect decision as to import volume; (d) failing to consider price suppression; and (e) dismissing overwhelming evidence of price underselling.

*Causation Standard*

■ Plaintiffs contend that Commissioner Rohr applied an overly burdensome causation standard, namely that he identified the causation standard as a question of whether the imports were a material cause of injury instead of correctly identifying the standard as whether less than fair val-

ue imports "are more than a *de minimis* factor in contributing to the injury." *See Maine Potato Council v. United States,* 9 CIT 293, 299, 613 F.Supp. 1237, 1243 (1985). Plaintiffs believe a remand instructing the Commissioner to apply the "contributing cause standard" is appropriate. Transcript of Oral Argument at 28.

Plaintiffs base their contention on the following sentence in Commissioner Rohr's Additional Views: "In the final analysis, however, it is neither the volume nor the price effect of imports in the abstract that establishes a causal nexus, but whether they have had a material impact on the performance of the industry." ITC Pub. 2033 at 59. The ITC contends that this argument "contradicts the plain language of Commissioner Rohr's Additional Views and misconstrues the Commissioner's statement in the quoted passage." Defendant's Memorandum in Response to Plaintiffs' Motion for Judgment Upon the Agency Record at 20. Defendant contends that the Commissioner was noting that the volume of the Swedish imports and their price effects should be examined in the context of the performance of the domestic industry when the Commissioner completed the paragraph from which the above sentence was taken by stating:

> Despite increases in both subject import volume and market penetration from 1984 to 1986, the domestic industry has continued to improve. In contrast, while import volume and market penetration have rapidly declined in 1987, the industry's performance has shown signs of weakening. This fact must be relevant to any causation analysis. In a previous steel investigation, the Commission concluded:
>
>> It is our view that, absent other significant evidence of causation, ... market penetration is insufficient to support a finding of material injury by reason of ... imports ... in the context of current conditions facing the domestic ... industry.

ITC Pub. 2033 at 59 (footnote omitted).

The Court holds that Commissioner Rohr did not apply an overly burdensome causa-

tion standard. Plaintiffs contend that the Commissioner was applying a standard of "material cause of injury" instead of the standard "cause of material injury" based upon the Commissioner's use of the words "material impact on the performance of the industry." Based upon his reasoning throughout his determination, it is clear to the Court that the commissioner was applying the correct standard. The steel investigation which the commissioner cited to support his causation determination stated that market penetration alone was not sufficient to support a finding of material injury.

Plaintiffs point to *Maine Potato* where the "Commission stated that LTFV imports were not a 'material cause' of the domestic industry's injury." 9 CIT at 299, 613 F.Supp. at 1243. In the instant determination, Commissioner Rohr found "no causal nexus between the subject imports and the requisite injury" and found "that the LTFV imports of welded stainless steel pipes and tubes from Sweden were not a cause of material injury." ITC Pub. 2033 at 53, 60. As the court in *Maine Potato* stated, this "court will not rely solely on what might be a simple mistake in word usage. . . ." 9 CIT at 299, 613 F.Supp. at 1243. The Court's concern is "whether the Commission actually weighed causes and improperly discounted a contributing cause of injury." *Id.*

The Court finds that a contributing cause of injury was not discounted by the Commissioner and holds that Commissioner Rohr's causation standard was supported by substantial evidence on the record and was otherwise in accordance with law.

*Relating Causation to Indicia of Injury*

■ Plaintiffs contend that the Commissioner failed to relate his causation determination to the indicia of material injury and that he failed to address certain indicators of causation. Plaintiffs argue that Commissioner Rohr first analyzed the conditions of the industry and found material injury. In searching for material injury, plaintiffs argue, the Commissioner examined factors such as decreasing sales, decreasing employment, decreasing wages

and low capacity utilization. Other factors which were considered indicated that production was improving and that capacity was improving to some extent. Plaintiffs claim that in determining causation, instead of asking whether the injury was a result of the imports, the Commissioner turned the question upside down, stating that since production was increasing and capacity was improving, there was no connection between the imports and the injury.

The ITC contends that the Commissioner explicitly related his analysis of the volume and price effects of the imports to the indicators of the condition of the domestic industry considered by the majority of the Commission. The ITC points out that Commissioner Rohr began his causation analysis by stating that "[c]ausation must be analyzed specifically in the context of the trends in industry performance during the period of investigation." ITC Pub. 2033 at 54. In addition, the ITC notes that the Commissioner discussed economic indicators such as "improvement in domestic production and production capacity." *Id.* The ITC points out that the Commissioner stated that "[d]espite increases in both subject import volume and market penetration from 1984 to 1986, the domestic industry has continued to improve." *Id.* at 59.

The Court holds that Commissioner Rohr's causation analysis was supported by substantial evidence on the record and is otherwise in accordance with law. The Commissioner applied the indicia of material injury to his analysis by "examining the role of imports" in the context of industry trends during the period of investigation. He found improvement in domestic production and production capacity, as well as large financial gains in the domestic industry, although a net operating loss was reported by integrated producers. *Id.* at 54.

Plaintiffs further contend that Commissioner Rohr did not address certain indicators of causation. Plaintiffs specifically argue that the following factors were not addressed: "impact of imports on domestic shipments, sales, capacity utilization, employment, productivity, hours worked, wages, total compensation, inventories,

ability to raise capital, and investment." Plaintiffs' Memorandum in Support of Their Motion For Judgment Upon the Agency Record at 65. These factors are among those set out in 19 U.S.C. § 1677(7)(C)(iii).

As stated above in the discussion of a similar claim plaintiffs made concerning Vice Chairman Brunsdale, the ITC is charged "only with rationally considering impact on the domestic industry in light of · the relevant factors in each case." *Gifford–Hill*, 9 CIT at 369, 615 F.Supp. at 587. In addition, the ITC is not required to issue a finding regarding a statutory requirement "simply because it was presented by the petitioner." *Id.* at 370, 615 F.Supp. at 587 (quoting *Jeannette Sheet Glass*, 9 CIT at 161–62, 607 F.Supp. at 130). In the instant case, the Court holds that data concerning the contested factors were included in the record and it therefore must be presumed that the ITC considered these factors.

*Import Volume*

 Plaintiffs contend that Commissioner Rohr overlooked three key facts in reaching his negative determination on import volume: (1) the overall trend in imports during the entire period of investigation; (2) the impact of the filing of the petitions and Commerce's subsequent preliminary dumping determination on the level of imports; and (3) the effect of Swedish sales from inventory after mid–1986.

Plaintiffs further contend that the Commissioner erred by not finding a causal nexus between import and injury. Plaintiffs assert that domestic indicators including shipments, employment, wages, production and capacity utilization declined when imports increased and increased when imports declined.

The ITC contends that the Commissioner did consider the overall trend in imports when he stated:

However, since the middle of 1986, Swedish imports have declined markedly, and accounted for only 1.5 percent of domestic consumption in the first half of 1987. This decline in imports is consistent with the Avesta's reported change in

its market strategy. Thus, while from 1984 to 1986 the volume and market share of the subject imports increased, the industry was showing signs of improvement. In contrast, since the middle of 1986, the Swedish imports have fallen rapidly while the U.S. industry's condition has worsened. These trends do not support a conclusion that the material injury being experienced by the U.S. industry was caused by the subject imports.

ITC Pub. 2033 at 54–55.

As to the filing of the petitions, the ITC contends that the Commissioner observed that the record indicated Avesta's import volume peaked in the first quarter of 1986. The countervailing duty petition was not filed until almost six months after the close of that period, (September 4, 1986), and the petition for the instant investigation was filed more than a month later (October 20, 1986). The ITC adds that the preliminary determination in connection with the instant investigation was issued more than thirteen months after volume began to decline. The Commissioner stated that the decline in imports was consistent with Avesta's change in market strategy. ITC Pub. 2033 at 55.

As to the effect of Swedish sales from inventory after mid–1986, plaintiffs point to a statement in the Dissenting Views of Commissioner Eckes and Commissioner Lodwick on Welded Stainless Steel Pipes and Tubes from Sweden: "[E]ven this strong growth trend understates the expansion in Sweden's market presence in 1986, as the importer sharply drew down his inventories of Swedish material during the year." ITC Pub. 2033 at 63. Defendant-intervenors contend that plaintiffs want the court to reweigh the evidence that the Commissioner considered. According to defendant-intervenors, based on the evidence, the Commissioner found that imports remained relatively low during the entire period in issue, although they did increase from 1984 to mid–1986 and decreased from mid–1986 onward. Defendant-intervenors claim that the record is more than adequate to support Commis-

934

sioner Rohr's conclusion, regardless of how the Swedish sales from United States inventory are treated.

The Court holds that Commissioner Rohr's determination regarding import volume was based upon substantial evidence on the record and otherwise in accordance with law. It is clear to the Court that the Commissioner considered the volume of imports "in the context of performance of the industry and market conditions during the period of investigation." ITC Pub. 2033 at 54. The Commissioner stated that he analyzed the role of imports and import volume in the context of trends in industry performance.

The timing of the petitions in the instant and countervailing duty investigations indicates that these petitions had no effect on import volume. Based on the record as a whole, the determination of Commissioner Rohr was based on substantial evidence and was otherwise in accordance with law.

*Price Suppression*

 Plaintiffs contend that Commissioner Rohr failed to consider price suppression in his determination. Plaintiffs claim that although the Commissioner examined price trends and found them to be stable, he did not ask whether the flat United States prices were suppressed by import prices. Plaintiffs further claim that the fact that domestic and imported prices had similar or parallel declines during 1985 and 1986 was caused by price suppression.

The ITC contends that the Commissioner must not simply determine whether domestic and imported prices follow similar trends, but must evaluate whether the effect of the imports "otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." *See* 19 U.S.C. § 1677(7)(C)(ii)(II). The ITC asserts that although Commissioner Rohr took note of the parallel price declines, he also noted the following: (1) "It is particularly telling that the lower price of the imported product did not lead to imports gaining a large share of the U.S. market and U.S. prices remained relatively stable," ITC Pub. 2033 at 57–58; (2) despite lower

import prices, the Swedish market share remained small, *Id.* at 54; (3) "Although the price data gave some mixed signals, prices of both the domestic like product and the subject welded stainless steel pipe and tube imports generally remained stable since 1984," *Id.* at 55; (4) "In the only product category for which trend comparisons were possible, prices of the domestic and imported product declined by two percent and three percent, respectively, from the first quarter of 1985 to the fourth quarter of 1986. From the fourth quarter of 1986 to the second quarter of 1987, the price of the domestic product increased by 3 percent while the import price dropped by 3 percent." *Id.*

These divergent trends support the Commissioner's determination of a lack of causal connection between the imports and price suppression or depression. The Court holds that Commissioner Rohr's determination concerning price suppression is supported by substantial evidence on the record and otherwise in accordance with law.

*Underselling*

 Plaintiffs contend that Commissioner Rohr found that Swedish imports consistently undersold domestic products, but discounted this underselling for reasons which were invalid.

The Commissioner stated the following concerning underselling:

I have also considered underselling in order to discover possible price effects of the Swedish imports. Swedish imports did consistently undersell the domestic product. *Absent corroboration from other indicators,* such as the changes in market share and price trends discussed above, underselling alone is not a sufficient basis for finding the existence of a causal nexus. Further, given the available data in this investigation, I have given relatively less weight to underselling than to other factors. As I noted in *Argentine Steel:*

Price comparisons will be better and entitled to greater weight when: (a) there are a greater number of comparisons; (b) the transactions are more

representative, i.e., there are many transactions in each comparison, there are uniform conditions, such as geography and purchasers, and there are more nearly identical products being compared.

ITC Pub. 2033 at 56 (footnotes omitted) (emphasis added). The Commissioner gave three reasons for giving limited weight to evidence of underselling: (1) "there were a limited number of price comparisons for any one product category"; (2) "significant differences were found between prices in various geographic regions"; and (3) "although the domestic product and the imported product are relatively fungible within given grades and sizes, there are customer preferences and lead time differences that support a price premium for the domestic good and partially limit the commercial interchangeability of the foreign and domestic products." *Id.* at 56–57. Commissioner Rohr concluded that "when considered within the context of the relatively small volumes of imports from Sweden and relatively stable domestic prices, the underselling in this investigation was insufficient to injuriously impact domestic producers." *Id.* at 59–60.

Plaintiffs contend that "corroboration from other indicators" could be found in the record and that this corroboration included the following factors: (1) low prices of Swedish imports which undersold United States products throughout the investigation period enabled the Swedish producer to gain market share between 1984 and 1986; (2) Swedish imports increased their market penetration from two to approximately four percent of domestic consumption; (3) Swedish producers' consistent underselling practices affected the prices of the domestic product and prevented price increases that would have occurred; and (4) evidence of lost sales. Plaintiffs further contest Commissioner Rohr's reasoning for giving less weight to the underselling data.

In *USX Corp. v. United States*, 12 CIT ——, 698 F.Supp. 234 (1988), the court affirmed the ITC's determination in *Argentine Steel* which Commissioner Rohr cited in support of his decision to give less weight to the evidence of underselling in the instant investigation. The court in *USX* noted that "it is within ITC's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." 12 CIT at ——, 698 F.Supp. at 239 (citing *Maine Potato*, 9 CIT at 300, 613 F.Supp. at 1244). In discussing Commissioner Rohr's decision to give less weight to the evidence of underselling, the court in *USX* stated it was "reasonable for ITC to give less weight to evidence of underselling when the sample from which the conclusion of underselling is drawn is relatively small." 12 CIT at ——, 698 F.Supp. at 239. In the instant investigation, Commissioner Rohr noted that there were "a limited number of price comparisons for any one product category." ITC Pub. 2033 at 56. In further support of his decision to give less weight to evidence of underselling, Commissioner Rohr cited to the legislative history of the Trade Agreements Act of 1979. *Id.* at 56 n. 5; S.Rep. No. 249, 96th Cong., 1st Sess., 88 (1979) ("the significance to be assigned to a particular factor is for the ITC to decide"); *reprinted in* 1979 U.S. Code Cong. & Admin.News, 381, 474; H.R. Rep. No. 317, 96th Cong., 1st Sess. 46 (1979) ("The significance of the various factors ... will depend upon the facts of each particular case").

In accordance with the considerable discretion with which Congress has vested the ITC as to the weight it will assign a given factor in making its injury determination, the Court holds that Commissioner Rohr's decision to give less weight to evidence of underselling is supported by substantial evidence on the record and otherwise in accordance with law.

## CONCLUSION

As set forth above, a remand of Chairman Liebeler's determination is ordered with instructions to evaluate the investigation in relation to the factors outlined in section 1677(7)(C)(iii) and section 1677(7)(B)(iii).