**SAARSTAHL AG, Usinor Sacilor, Unimétal, Ascométal, and United Engineering Steels Ltd., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Inland Steel Bar Co., and Corey Steel Co., Defendant–Intervenors.**

Court No. 93–04–00219–S.
Slip Op. 94–103.

United States Court of International Trade.

June 24, 1994.

Steptoe & Johnson, Richard O. Cunningham, Peter Lichtenbaum and Mark D. Davis, Washington, DC, for plaintiff United Engineering Steels Ltd.

LeBoeuf, Lamb, Greene & MacRae, Pierre F. de Ravel d'Esclapon and Mary Patricia

Michel, New York City, for plaintiff Saarstahl AG.

Weil, Gotshal & Manges, A. Paul Victor and Angela J. Paolini Ellard, New York City, for plaintiffs Usinor Sacilor, Unimétal and Ascométal.

Lyn Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, U.S. Intern. Trade Com'n, Scott D. Andersen, Washington, DC, for defendant.

Wiley, Rein & Fielding, Charles Owen Verrill, Jr., Alan H. Price and Brian E. Rosen, Washington, DC, for defendant-intervenor Inland Steel Bar Co.

Thompson & Mitchell, Murray J. Belman and Duane W. Layton, Washington, DC, for defendant-intervenor Corey Steel Co.

## OPINION

CARMAN, Judge:

Plaintiffs contest the International Trade Commission's (Commission or ITC) final affirmative injury determination in *Certain Hot–Rolled Lead and Bismuth Carbon Steel Products from Brazil, France, Germany, and the United Kingdom,* Inv. Nos. 701–TA–314 through 317, Inv. Nos. 731–TA–552 through 555, USITC Pub. 2611 (1993) (*Injury Determination*). The Commission published notice of its final affirmative determination on March 17, 1993. *Certain Hot–Rolled Lead and Bismuth Carbon Steel Products From Brazil, France, Germany, and the United Kingdom,* 58 Fed.Reg. 14,422 (1993) (*Notice*). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

The products which were the subject of the ITC's investigation are "hot-rolled products of nonalloy or other alloy steel, whether or not descaled, containing by weight 0.03 percent or more of lead or 0.05 percent or more of bismuth, in coils or cut lengths, and in numerous shapes and sizes." *Notice,* 58 Fed. Reg. at 14,422 n. 2. Pursuant to a petition filed by Inland Steel Corporation and Bethlehem Steel Corporation, the U.S. Department of Commerce (Commerce) initiated CVD and antidumping investigations of Brazil, France, Germany and the United Kingdom. On September 17, 1992, Commerce issued its preliminary determinations which it ultimately finalized on January 27, 1993.

After Commerce preliminarily determined imports of the subject merchandise were being subsidized within the meaning of 19 U.S.C. § 1671b(b) (1988), and were being sold at less than fair value (LTFV) within the meaning of 19 U.S.C. § 1673 (1988), the ITC commenced its investigation. *Notice,* 58 Fed.Reg. at 14,423. The ITC requested data for the period January 1989 through September 1992 from domestic producers, importers and foreign producers. After reviewing the questionnaire responses and providing the parties with an opportunity to comment, the Commission unanimously determined subject imports from Brazil, France, Germany and the United Kingdom were materially injuring an industry in the United States. *Id.* at 14,422.

## CONTENTIONS OF THE PARTIES

Plaintiffs complain the ITC's affirmative injury finding is not supported by substantial evidence on the record. According to plaintiffs, the ITC failed to determine whether the subject imports were causing *present* material injury to the domestic industry. Additionally, plaintiffs claim the Commission ignored the following record evidence demonstrating the absence of injury: declining import volume; increasing domestic market share, production and shipments; increasing apparent U.S. consumption; and increasing industry profitability at the end of the period of investigation. Plaintiffs argue the ITC should not have made an affirmative injury determination if the domestic industry is merely suffering from the lingering effects of an injury experienced earlier in the investigation period.

The ITC maintains its determination directly addressed the issue of present material injury and is supported by substantial evidence on the record. The Commission argues substantial evidence indicates throughout the period of investigation (1) subsidized and LTFV subject imports were significant in terms of both volume and mar-

ket share; (2) significant underselling and price suppression and depression occurred; and (3) the volume and price effects of the subject imports materially injured the domestic industry. Furthermore, the ITC contends it must base an injury determination on a continuing effects analysis, not on the condition of the industry on vote day.

Defendant–Intervenors support the Commission's position that the statutory scheme supports an approach of analyzing the industry over the period of investigation and not solely on vote day. According to defendant-intervenors, a vote day approach would lead to an anomalous result: the more effective the provisional remedies, the less likely final relief would ever be granted. If the Court holds the Commission must base its injury determination on the condition of the industry on vote day, then defendant-intervenors argue the ITC's determination should still be sustained because the Commission relied on indicia of current injury.

## STANDARD OF REVIEW

The Court must sustain the Commission's final injury determination if it is based on substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted). The presence of some contradictory evidence is not in and of itself sufficient reason for this Court to vacate a final injury determination by the ITC. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted).

## DISCUSSION

Commerce initially determined Saarstahl AG and United Engineering Steels Ltd. received subsidies within the meaning of 19 U.S.C. § 1671b(b) and were selling subject merchandise at LTFV within the meaning of 19 U.S.C. § 1673. *See Certain Hot–Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed.Reg. 6205 (Dep't Comm.1993) (final antidumping determination); *Certain Hot–Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom,* 58 Fed.Reg. 6207 (Dep't Comm. 1993) (final antidumping determination); *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed. Reg. 6233 (Dep't Comm.1993) (final countervailing duty determination), as modified by *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany* (Oct. 12, 1993); *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom,* 58 Fed. Reg. 6237 (Dep't Comm.1993) (final countervailing duty determination), as modified by *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom* (1993). This Court, however, held Commerce erred as a matter of law in finding Saarstahl AG and United Engineering Steels Ltd. received subsidies within the meaning of 19 U.S.C. § 1671b(b). *See Saarstahl AG v. United States,* 18 CIT ——, 858 F.Supp. 187 (1994); *Inland Steel Bar Co. v. United States,* 18 CIT ——, 858 F.Supp. 179 (1994). Nonetheless, these decisions do not impact the Court's analysis in this case because the Commission unanimously determined an industry in the U.S. is materially injured by reason of LTFV imports from Germany and the United Kingdom. *Injury Determination* at 3. The Court, therefore, need not order the Commission to reconsider its determination because it does not "appear the ITC made its finding of injury based upon material and significant inaccurate facts." *Borlem S.A. v. United States,* 13 CIT 535, 541, 718 F.Supp. 41, 46 (1989), *aff'd,* 8 Fed.Cir. (T) 164, 913 F.2d 933 (1990).

Once Commerce determines subject imports are being subsidized or dumped, the ITC must determine whether a domestic industry is materially injured or threatened with material injury "by reason of imports,

or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination." 19 U.S.C. § 1671d(b)(1) (1988); 19 U.S.C. § 1673d(b) (1988). In making its final determination, the Commission must consider (1) the volume of the subject imports, (2) the effect of the subject imports on domestic prices of like products, and (3) the impact of the subject imports on the production of like products by domestic producers. 19 U.S.C. § 1677(7)(B)(i) (1988).

In examining the impact of imports on the merchandise at issue, the Commission must "evaluate all relevant economic factors which have a bearing on the state of the industry in the United States." 19 U.S.C. § 1677(7)(C)(iii). These factors include, but are not limited to, the following:

> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>
> (II) factors affecting domestic prices,
>
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and
>
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

*Id.* Commerce may also consider "such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." 19 U.S.C. § 1677(7)(B)(ii).

With these statutory requirements in mind, the ITC investigated the domestic industry and subject imports for the period 1989 through September 1992. The Commission found apparent U.S. consumption of free-machining products dropped by 13.9% from 1989 to 1991. A comparison of the period January–September 1992 to the same period in 1991, however, shows apparent consumption increased by 29.1%. *Injury Determination* at 35–36, I–37. The ITC found this increase was due to "the impact of overall economic activity, ... certain stockpiling

activity, new long-term contracts for products previously supplied by foreign sources, and accelerated purchases from Bethlehem following the announced sales of its Bar, Rod & Wire Division." *Id.* at 36 (footnotes omitted). The domestic producers share of this consumption dropped from 79.4% in 1989 to 74.9% in 1991. *Id.* at 36, I–42. U.S. producers held a 77.8% market share during January–September 1992, an increase of .6% over the same period in 1991. *Id.* at 36, I–42.

The Commission also found production of bar and rod products dropped by 17.2% from 1989 to 1991, reducing capacity utilization from 59.5% in 1989 to 47.3% in 1991. During the January–September 1992 period, however, production increased 32.6% over the same period in 1991, increasing capacity utilization from 44.0% in 1991 to 56.3% in 1992. *Id.* at 36, I–43. Domestic producers' shipments of bars and rods declined by 18.8% from 1989 to 1991, but January–September 1992 shipments increased 30.1% over the same period in 1991. *Id.* at 36–37, I–45. The financial data for the period under review showed mixed results. Net sales increased marginally from 1989 to 1990, decreased from 1990 to 1991, and increased from interim 1991 to interim 1992. Gross profit decreased from 1989 to 1991, but increased from interim 1991 to interim 1992. Operating losses increased from 1989 to 1990 and decreased from 1990 to 1992. *Id.* at 37, I–57.

Although U.S. producers' inventories increased from 7.0% in 1989 to 8.6% in 1991, January–September 1992 inventories of 8.6% showed an improvement over the same period in 1991 which totalled 9.1%. *Id.* at I–45. The average number of production and related workers, hours worked and wages and total compensation paid declined from 1989 to 1991 but all showed gains in the January—September 1992 period as compared with the interim period in 1991. *Id.* at 37, I–50.

The Commission received comments from domestic producers regarding the impact of the subject imports on their growth, investment, ability to raise capital, and existing development and production efforts. These comments indicate a number of U.S. produc-

ers "are not as presently competitive as they should be because they were not able to invest in much needed capital equipment during the period of investigation." *Id.* at 50 (footnote omitted); Report H–1.

Plaintiffs complain the ITC failed to analyze all the evidence on the record. According to plaintiffs the Commission ignored substantial evidence demonstrating improvements in eight key indicia of injury between January and September 1992.

The record in this case reveals what appears to be a trend toward improved conditions from January 1992 through September 1992. The Commission reasonably found these apparent improvements resulted from announcements by Bethlehem and Inland Steel that they were ceasing production of certain products and Commerce's and the ITC's preliminary investigations. *Id.* at 35. This finding by the Commission demonstrates it did not ignore evidence of improvements on the record. Moreover, "[a]bsent a showing to the contrary, the Commission is presumed to have considered all the evidence in the record." *Trent Tube Div., Crucible Materials Corp. v. United States,* 14 CIT 386, 395, 741 F.Supp. 921, 930 (1990), *aff'd,* 10 Fed.Cir. (T) ——, 975 F.2d 807 (1992) (quotation and citation omitted). Furthermore, plaintiffs cannot complain about the relative weight the Commission accords the various factors it analyzes because, as the legislative history pertaining to material injury instructs,

> [t]he significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide.

S.REP.NO. 249, 96th Cong., 1st Sess. 88 (1979), *reprinted in,* 1979 U.S.C.C.A.N. 381, 474; *see also Trent Tube,* 14 CIT at 403, 741 F.Supp. at 935 (Congress has vested the ITC with considerable discretion to determine the weight it will assign a given factor in making its injury determination).

■ The main thrust of plaintiffs' argument is that the ITC failed to determine whether the subject imports were causing *present* material injury to the domestic industry. Plaintiffs point to the improvement in relevant factors during the period January 1992 through September 1992 as proof of the lack of *present* material injury. In support of this argument, plaintiffs cite to *CHR. Bjelland Seafoods v. United States,* 16 CIT 945, Slip Op. 92–196, 1992 WL 317538 (Oct. 23, 1992) (*Norwegian Salmon*). According to plaintiffs, *Norwegian Salmon* requires the Commission to equate "present" material injury with material injury as of "vote day."

The Court in *Norwegian Salmon* held the Commission's affirmative material injury determination was not supported by substantial evidence on the record. *Id.* at *10, Slip Op. 92–196. The Court found fault in the ITC's determination that the effects of a previous injury are sufficient for a finding of present material injury. *Id.* at *10, Slip Op. 92–196. The Court stated § 1677(7)(C)(iii) "does not authorize the Commission to base a material injury determination on the lingering effects of a past injury." *Id.* at *9–10, Slip Op. 92–196. Instead, this section "instructs the Commission to [examine] more thoroughly . . . the factors in its material injury analysis where there is a possibility that negative effects of a present injury are latent." *Id.*

The Court does not agree with plaintiffs that *Norwegian Salmon* mandates the ITC to base its material injury determination on the condition of the domestic industry as of vote day. Instead, the Court interprets *Norwegian Salmon* to advocate the use of information concerning the domestic industry in as contemporaneous a time frame as possible. The quest for up-to-date information, however, should not be at the expense of overlooking the "possibility that negative effects of a present injury are latent." *See id.* at *10, Slip Op. 92–196. It is for this reason, the Court normally defers to the Commission's discretion in choosing the most appropriate period of time for its investigation. *See Kenda Rubber Indus. Co. v. United States,* 10 CIT 120, 126–27, 630 F.Supp. 354, 359 (1986) (footnote omitted) ("As the statute does not expressly command the Commission

to examine a particular period of time, the Court finds that the Commission has discretion to examine a period that most reasonably allows it to determine whether a domestic industry is injured by LTFV imports). Additionally, if the ITC were required to look only at information collected just prior to vote day, the interested party comment provisions established by Congress would be rendered moot. *See, e.g.,* 19 U.S.C. § 1677c(a) (1988) (requiring the ITC to hold a hearing upon the request of any party to an investigation before reaching a final determination); 19 U.S.C. § 1677f(e) (1988) (permitting the ITC to refuse information submitted without an adequate opportunity for comment). There is nothing in the instant action demonstrating the Commission abused its discretion by relying on the period January 1989 through September 1992. Accordingly, the Court holds the Commission properly based its determination on evidence covering this time period.

■ The Court now turns to the issue of whether there is substantial evidence on the record from the period January 1989 through September 1992 supporting the ITC's affirmative injury finding. The Commission considered the impact of subject imports on the domestic industry's "ability to raise capital" and make "investments" pursuant to § 1677(7)(C)(iii)(III), and concluded the domestic industry was *presently* adversely impacted. In contrast to *Norwegian Salmon,* the evidence in the instant action shows the domestic industry's inability to invest continued to the most recent period in which the Commission collected data.

Additionally, the Commission in the instant action specifically addressed respondents' argument pertaining to reasons for the price increases by the domestic industry and other signs of "improvement" in 1992. The Commission indicated the "improvements" were due to improvement in overall economic activity, stockpiling due to the imminent closure of certain domestic facilities, new long-term contracts for products previously supplied by foreign sources, and Commerce's and the ITC's preliminary investigations. *See Injury Determination* at 36. Plaintiffs' fail to demonstrate to the Court how the

Commission's conclusion regarding the 1992 "improvements" is unreasonable or not supported by the record. *See Negev Phosphates, Ltd. v. U.S. Dep't of Commerce,* 12 CIT 1074, 1077, 699 F.Supp. 938, 942 (1988) (citations omitted) ("[T]he Court will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence."). Because there is substantial evidence on the record indicating injury to the domestic industry from subject imports due to, among other things, an inability to raise capital and make investments, and because there are no indications on the record of real improvements in the domestic industry, the Court sustains the agency's final affirmative injury determination for the period January 1989 through September 1992.

■ Plaintiffs also complain the ITC did not give adequate consideration to the role of minimills in the free-machining marketplace. According to plaintiffs this lack of consideration impacted the Commission's analysis of the available pricing data.

The relevant statute directs the Commission to "evaluate all relevant economic factors which have a bearing on the state of *the industry* in the United States...." 19 U.S.C. § 1677(7)(C)(iii). The ITC interpreted § 1677(7)(C)(iii) as requiring it to analyze the condition of the industry as a whole, not particular segments, and therefore declined to base its decision exclusively on minimills. In further support of its decision not to use minimills as the sole basis of comparison, the Commission indicated minimills "have a much lower, and more efficient cost structure" than the "larger, allegedly less efficient, integrated [foreign] producers." *Injury Determination* at 33.

"Industry" is defined for general purposes of CVD law as "the domestic producers *as a whole* of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of the product[.]" 19 U.S.C. § 1677(4)(A) (1988) (emphasis added); *see also Copperweld Corp. v. United States,* 12 CIT 148, 166, 682 F.Supp. 552, 569 (1988) (The language of § 1677(4)(A) "defies the

suggestion that the ITC must make a disaggregated analysis of material injury."). The second part of § 1677(4)(A)'s definition of industry, "producers whose collective output of the like product constitutes a major proportion of the total domestic production of the product," is inapplicable because minimills make up only approximately 20% of the production of hot-rolled free-machining bar and rod. *Injury Determination* at 34. The Commission in the instant action, therefore, must look to the first part of this definition for guidance. Because the Commission has reasonably interpreted § 1677(7)(C)(iii) as requiring it to assess the condition of the industry *as a whole* consistent with § 1677(4)(A), the Court holds the agency properly declined to limit its analysis to minimills. *See U.H.F.C. Co. v. United States,* 9 Fed.Cir. (T) 1, 10, 916 F.2d 689, 698 (1990) (citations omitted) ("It is well settled that an agency's interpretation of the statute it has been entrusted by Congress to administer is to be upheld unless it is unreasonable.").

## CONCLUSION

After considering all of plaintiffs' arguments, the Court holds the Commission's affirmative injury determination is supported by substantial evidence on the record and is otherwise in accordance with law. Accordingly, the Court denies plaintiffs' motion and sustains *Certain Hot–Rolled Lead and Bismuth Carbon Steel Products From Brazil, France, Germany, and the United Kingdom,* Inv. Nos. 701–TA–314 through 317, Inv. Nos. 731–TA–552 through 555, USITC Pub. 2611 (1993). This action is dismissed.

## ATTACHMENT

### SCHEDULE OF CONSOLIDATED CASES

*Usinor Sacilor v. United States,* Court No. 93–04–00230–S

*United Engineering Steels Ltd. v. United States,* Court No. 93–04–00235–S